# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re New Oriental Education & Technology Group Inc. Securities Litigation | Civil Action No. 1:22-cv-01014-VM <br><br> <u>CLASS ACTION</u> <br><br> AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.   PRELIMINARY STATEMENT ................................................................................ 2

II.  JURISDICTION & VENUE ................................................................................. 11

III. THE PARTIES.................................................................................................... 12

    A.   Lead Plaintiff ......................................................................................... 12

    B.   Defendants ............................................................................................. 12

    C.   Relevant New Oriental Executives ...................................................... 15

IV.  BACKGROUND AND OVERVIEW OF DEFENDANTS' FRAUD ........................... 16

    A.   New Oriental's Business and China's Multi-Billion Dollar For-Profit
        Education Industry ................................................................................. 16

    B.   The Growth of the For-Profit Education Industry in China.................................. 18

    C.   For-Profit Education Policymaking Under President Xi Jinping ........................ 19

    D.   Before the Class Period, the Chinese Government Begins Cracking Down
        on For-Profit Education Abuses.............................................................................. 21

    E.   Following the After-school Tutoring Crackdown and the Implementation
        of the 2018 Regulations, New Oriental Assured Investors Concerning Its
        Compliance with and the Benefits It Obtained from Government Scrutiny......... 25

    F.   New Oriental Takes Koolearn Public in Hong Kong to Capitalize on Its
        Inflated Valuation ................................................................................. 29

    G.   New Oriental Quickly Rebounds After the Onset of the Pandemic, Grows
        Its Online Business, and Conducts a Global Offering While Falsely
        Claiming the Company Had "Never Been Penalized" for Violating
        Regulations ............................................................................................. 31

    H.   In Truth, New Oriental Secretly Engaged In Illicit Schemes To Boost
        Student Enrollments and Revenues ...................................................... 33

        1.   New Oriental Falsified Teacher Credentials for Over 70% of the
            "Famous Teachers" It Featured on Its Website ........................ 34

        2.   New Oriental Used Deceptive Advertising to Hide the True Costs
            of Its Programs.............................................................................. 36

3.      New Oriental Used Deceptive Promotions To Mislead Its
Customers About The Content And Nature Of Its Programs .................. 37

I.      New Oriental Senior Executives Learn of the Government's Policy Shift
But Falsely Misrepresent the Company's Compliance, the Outcome of the
"Two Sessions" Deliberations, and the Impact of the Pending Regulations ........ 38

J.      New Oriental Falsely Reassures Investors About the Double Reduction
Policy and Claims the Government Crackdown Will Benefit the Company ........ 42

K.      New Oriental Secretly Expands Into New Business Areas Not Prohibited
by the Double Reduction ........................................................................ 44

L.      New Oriental Learns of the Formal Double Reduction Measures But
Publicly Denies Their Impact ................................................................ 47

M.      New Oriental Insiders Sell Millions of Dollars of Their Personally Held
Shares After Learning of the Double Reduction Measures ................................ 50

N.      New Oriental Continues to Falsely Downplay the Severity of the Double
Reduction Measures As Investors Begin to Learn the Truth ............................... 51

O.      Chinese Regulators Disclose the Double Reductions Measures, Triggering
Massive Declines in the Price of New Oriental Shares ......................... 53

V.      POST-CLASS PERIOD EVENTS AND ADMISSIONS ................................ 55

A.      New Oriental Cancels Planned Filings And Avoids Answering Analysts'
Questions for an Entire Year .................................................................. 56

B.      Defendant Yu Reveals Additional Mass Layoffs, Previously Denied by the
Company ................................................................................................ 57

VI.     ADDITIONAL ALLEGATIONS OF SCIENTER ......................................... 58

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS ................................................................................... 66

A.      Materially False and Misleading Statements and Omissions Concerning
New Oriental's Business Conduct and Compliance with Regulations ................ 67

1.      Materially False and Misleading Statements Concerning
Compliance with Teacher Qualification Requirements ........................... 68

2.      Materially False and Misleading Statements Concerning
Compliance with Curriculum Content Regulations ................................. 71

3.      Materially False and Misleading Statements Concerning False
Advertising Placed by New Oriental ....................................... 72

B.   Materially False and Misleading Statements and Omissions Concerning New Oriental's Revenue Drivers and the Benefits of Increased Government Scrutiny into For-Profit After-school Tutoring.................................. 73

1.   Materially False and Misleading Statements Concerning New Oriental's Revenue Drivers during Fiscal Year 2020.............................. 81

2.   Materially False and Misleading Statements Concerning New Oriental's Revenue Drivers during Fiscal Year 2021............................... 88

C.   Materially False and Misleading Statements Concerning Increased Government Regulation and Scrutiny of the After-School Tutoring Industry ...................................................................................................... 91

VIII.   LOSS CAUSATION ........................................................................................ 95

IX.   PRESUMPTION OF RELIANCE ................................................................... 97

X.   THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................................ 98

XI.   CLASS ACTION ALLEGATIONS ............................................................... 100

XII.   COUNTS ........................................................................................................ 102

XIII.   PRAYER FOR RELIEF ................................................................................. 104

XIV.   JURY DEMAND ............................................................................................ 105

1.      Lead Plaintiff ACATIS Investment Kapitalverwaltungsgesellschaft mbH ("ACATIS" or "Lead Plaintiff"), by its undersigned counsel, brings this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants New Oriental Education & Technology Group Inc. ("New Oriental" or the "Company"), its founder and Chairman Michael Minhong Yu ("Yu"), CEO Chenggang Zhou ("Zhou"), and CFO Zhihui Yang ("Yang") (collectively, "Defendants").  Lead Plaintiff brings these claims on behalf of a class of investors who purchased or otherwise acquired New Oriental American Depository Shares ("ADSs" or "shares") from October 23, 2018 through July 25, 2021, inclusive (the "Class Period") and were damaged thereby.

2.      Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and their own acts are based upon the investigation of Lead Plaintiff and its counsel, including (1) review and analysis of documents filed publicly by New Oriental and New Oriental's online technology subsidiary Koolearn Technology Holding Ltd. ("Koolearn") with the SEC and the HKEX, the Hong Kong securities exchange; (2) New Oriental and Koolearn press releases, presentations and other public statements; (3) transcripts of New Oriental and Koolearn investor conference calls; (4) research reports by financial analysts and news reports concerning New Oriental and Koolearn; (5) other publicly available sources as described below; (6) consultations with relevant experts and consultants; and (7) communications with former employees of New Oriental and other sources. Lead Plaintiff's investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their

custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I.    PRELIMINARY STATEMENT

3.     This action arises out of a series of false and misleading statements that the executives of the largest for-profit education company in China made about the two most important aspects of its business—its compliance with existing regulations governing after-school tutoring and the impact of new regulations that had been adopted by the Chinese government during the Class Period but were not publicly disclosed until the end of the Class Period.

4.     New Oriental was founded by billionaire business celebrity Michael Minhong Yu, often called the "richest teacher in China" and the "Godfather" of China's for-profit education industry.  While Defendant Yu founded New Oriental as a test-preparation services provider for Chinese students taking college entry exams like TOEFL—the "Test of English as a Foreign Language" exam for foreign-language speaking students required by most U.S. universities—and the GRE, by the start of the Class Period, New Oriental's business centered on providing after-school tutoring services for compulsory school-aged children in China.

5.     In fact, by 2018, New Oriental was far and away the largest provider of after-school tutoring in China, and the market leader in what was then a fast-growing $70 billion-a-year industry.  The growth of private after-school tutoring services in China had been spurred by demographic trends, as well as the unique socio-educational framework dictating children's economic prospects in China. Specifically, increasing competition to perform well on the Gaokao—the highly competitive entrance exam that determines whether a child can attend university, which one, and what subjects the child will learn—as well as a drastic increase in the number of higher education schools in China, led to an explosion in spending on after-school tutoring services.  As New Oriental explained in its SEC filings, "anxiety among Chinese parents

and intensified competition between students" for the Gaokao (as well as a similar exam for high school admittance called the Zhongkao) fueled a "lasting and booming demand for K-12 after-school tutoring."

6.      After listing its shares on the New York Stock Exchange 2006 under the ticker symbol "EDU," New Oriental sought to capitalize on this competitive test-driven environment and in 2008 began offering after-school tutoring programs for students in kindergarten through twelfth grade ("K-12"). In the following years, and after settling claims that it helped Chinese students cheat on U.S. entrance exams brought by nonprofit test provider administrator Educational Testing Service (which administers the TOEFL and GRE), New Oriental's business grew exponentially based on the success of its K-12 after-school tutoring programs. For example, in just a few short years before the start of the Class Period, New Oriental expanded from 700 to over 1,000 schools and in-person learning centers, increased enrollment from 600,000 to over 2 million students, and grew its annual revenues from under $1 billion to over $2.4 billion from 2014 through 2018— gains that were almost wholly attributable to New Oriental's after-school tutoring programs.

7.      However, the same ultra-competitive environment that drove New Oriental's profits also led to abusive practices in the tutoring industry and increasing concerns by policymakers about the burdens placed on children. By 2018, government officials and policymakers identified after-school tutoring programs as creating excessive extracurricular burdens on students and increasing economic burdens on families—concerns that were exacerbated by advertisements that misled customers concerning teacher qualifications and the effects of instruction.

8.      In response to these abuses, and following a government study finding that over half of surveyed for-profit institutions lacked the required teaching certificates or business licenses,

the Chinese government implemented a series of regulations in 2018 that strengthened inspection, licensing requirements and other oversight of for-profit education providers. Among other things, those regulations (referred to herein as the "2018 Regulations") required for-profit tutoring providers to file with local education authorities the class, courses, target students, class hours and other information; prohibited centers from instructing students in areas beyond the scope or level of the public-school curriculum; barred institutions from charging fees for more than three months of instruction at a time; imposed testing and teacher credentialing requirements; and strengthened prohibitions on false and misleading advertising. Throughout 2019, the government imposed similar measures on for-profit "online" providers like New Oriental's Koolearn division.

9.      While these regulations were initially viewed by New Oriental investors as a threat, the Company and its executives presented them as a boon to the Company's business. At the start of the Class Period, the Company told investors that these new regulations would benefit market leaders like New Oriental, as increased regulatory costs were too onerous for and rooted out smaller, more unscrupulous for-profit providers. For example, in response to analysts' questions about the new regulations in an October 2018 earnings call, Defendant Yang reassured investors that, "as a leading education provider, absolutely we fully support the government reforms," which Yang claimed actually represented a "great opportunity" for New Oriental "to take more market share from the small players." In fact, New Oriental represented throughout the Class Period that the Company conducted its business in the "proper way" and in compliance with the regulations, that increased government scrutiny had led to students switching from "smaller players to join our classes," and that this phenomenon had resulted in substantial revenue gains.

10.     Defendants' representations had their desired effect, with analysts praising New Oriental's market-leading position and supposedly exemplary compliance record as a key benefit.

For example, by January 2019, UBS analysts noted that New Oriental had already seen the "'benefits' of regulations emerging," concluding that "more compliant players like EDU are well positioned to capture more shares in the AST market in China." In another example, JPMorgan analysts noted in an October 2019 report that the "recent regulation changes will likely marginalize smaller players, and we expect EDU to gain significant market share as a result." The analysts gave New Oriental shares their highest rating and projected the Company would triple annual earnings to approximately $1 billion in just three years. New Oriental continued to benefit from the reputation it cultivated throughout the Class Period, including by launching a public listing of its online platform Koolearn on the HKEX in March 2019, and listing New Oriental's common stock on HKEX through an offering that raised over a billion dollars in November 2020.

11.    Unfortunately for investors, New Oriental's claims of scrupulous compliance with the 2018 Regulations were false and, in reality, the government's increasing scrutiny into the for-profit education sector posed an existential threat to the Company's business.

12.    To start, contrary to the Company's claims that its schools "have never been penalized for the reason of tutoring content," in reality, New Oriental repeatedly violated—and was in fact penalized by government regulators for violating—those regulations. In addition, New Oriental routinely falsified its teachers' credentials and misled parents about the prices of its programs. For example, an investigation by government regulators found that New Oriental falsified qualifications and credentials of 76 of the 103 "Famous Teachers" featured on its website as the key lecturers for its after-school tutoring programs. In another example, New Oriental promoted courses as being offered at a 90% discount from their regular price—but in fact never sold any courses at that "regular" price.

13.     Unknown to investors, however, these concealed practices generated increasing scrutiny from Chinese government regulators and policymakers.  But when those policymakers made increasingly strong statements about abuses in the after-school tutoring industry, the Company flatly denied any misconduct and falsely represented additional regulations would benefit New Oriental by allowing it to capture market share from smaller players that, unlike New Oriental, did not or could not comply with the regulations.

14.     Starting in January 2021, Chinese officials issued a series of strong warnings concerning misconduct in the industry.  For example, on January 18, 2021, China's Central Commission for Discipline Inspection issued an article reviewing recent capital raising by for-profit education companies and reiterated its ongoing oversight and enforcement of the Ministry of Education's 2018 Regulations.  On February 4, the Chinese Ministry of Education released the full text of a speech by Minister Chen Baosheng outlining the Ministry's priorities in 2021 to tighten supervision in the after-school tutoring sector to "rectify mercenary behaviors, subject training, wrong speeches, anomie of teachers' morality, and false advertisements."

15.     Then, in March 2021, the practices of the for-profit education industry became a primary focus of the "Two Sessions," the most important annual gathering in China's political calendar, where the main two political bodies set the year's priorities and plans.  During the 2021 Two Sessions, China's President Xi Jinping offered unusual and sharp criticisms of after-school tutoring, describing it as "chaotic" and a "stubborn disease that is difficult to manage" where parents "are afraid they will lose at the starting line in a competition over scores."

16.     Defendant Yu was intimately involved in the Two Sessions discussions and for months prior to that time actively lobbied party leaders in an effort to shape new regulations targeting the Company's business.  In fact, Defendant Yu had specialized insight through his

relationships with the primary policymakers that crafted China's education policy, was kept abreast of the specifics of the regulations President Xi ordered be implemented at the Two Sessions, and knew no later than May 2021 that the for-profit education industry as it then existed in China was going to be shut down.

17.    In fact, Defendant Yu understood by the time of the Two Sessions that he could not prevent the impending crackdown.  As a result, instead of taking a leading role in policy discussions, as Defendant Yu had done the year before and in over a decade of attending Two Sessions meetings as a prominent delegate, at the March 2021 gathering, Defendant Yu "did not publicly defend the off-campus tutoring market."

18.    Immediately following President Xi's unusual and sharp comments at the Two Sessions, on March 10, Beijing educational authorities suspended reopening of all in-person training classes (which had shut down weeks before due to a resurgence of COVID-19 cases) so that they could conduct inspections of business licenses, teacher qualifications, and advertising. At the same time, New Oriental began undertaking drastic measures to "pivot" the Company's business away from after-school tutoring by investing in other areas that were not targeted by the Double Reduction regulations.  Further, that month, New Oriental secretly initiated massive layoffs, eliminating 20% of its employees, and regulators began pulling television commercials that New Oriental had ordered to promote its after-school tutoring services.  And on May 7, New Oriental representatives met with Beijing Communist Party leaders to discuss the new regulations that would eventually be disclosed as the "Double Reduction" measures and how they would be implemented.

19.    But when investors, analysts, and reporters began asking New Oriental about the impending regulations and the measures the Company was taking in response, the Company

7

dismissed investors' concerns and falsely denied it had taken "any steps" to address the pending crackdown on for-profit tutoring. Rather than admit the truth—that the Company was taking drastic measures to reorient its business in the face of regulations that would eliminate 60% of its revenues—New Oriental flatly and falsely denied it was implementing massive layoffs, that it had placed any television ads, and dismissed investor concerns as premised on unfounded "market rumors."

20.     The reforms that President Xi addressed at the Two Sessions were finalized and adopted on May 21, 2021—but were not publicly released until months later. Specifically, on May 21, the Leading Group on Comprehensively Deepening Reform ("LGCDR"), headed by President Xi, "reviewed and passed" the "Opinions on further reducing the burden of homework and off-campus tutoring for students undergoing compulsory education"—the opinions that would later be publicly disclosed as the "Double Reduction" measures.

21.     New Oriental and its senior executives immediately learned the details of the Double Reduction measures as approved by President Xi, which confirmed that after-school tutoring would no longer be permitted to be carried out as a for-profit business. However, the official opinions that had been formulated at the Two Sessions and formalized on May 21 would not be publicized until months later, and thus investors were forced to rely on New Oriental's representations concerning the impact and import of the rules approved by President Xi.

22.     Unfortunately for investors, Defendants falsely represented that the new regulations would not materially impact New Oriental's business and, if anything, would benefit the Company. For example, when addressing responding to questions about the reforms discussed during the Two Sessions on the Company's April 20, 2021 earnings call, Defendant Yang represented that New Oriental had "great confidence" about its prospects. According to Defendant Yang, "the

government's intention to tighten the after-school tutoring business policy is not a surprise to us as it has been discussed for a long time since 2018," and New Oriental believed "the regulator's efforts will foster a positive environment for the whole market." New Oriental went so far as to assure investors that further regulations would not have "any material impact" on top line revenues and would instead enable New Oriental to "further take market share from other players."

23.    Defendants' representations had their intended effect, with analysts at Nomura rejecting a May 12 report about "rumors" concerning severe restrictions on for-profit tutoring as an outcome that "we think…will NOT happen." Rather, Nomura recommended investors reject a "misleading news report" concerning potential bans, maintained their long-term industry outlook, and concluded their "top pick" remained New Oriental. Similarly, following a New Oriental investor presentation on May 26, 2021, Morgan Stanley analysts reported that the "company did not see an impact from these regulations yet, and company is compliant now regarding the requirements of advertising in terms of wording and promotion."

24.    Even as investor concerns over the severity of the impending regulations intensified throughout June 2021, New Oriental falsely assured investors that it could manage any potential regulatory outcome. For example, after a June 16 *Reuters* report suggested the impending regulations would be far harsher than investors appreciated, and a separate report suggested that New Oriental was cancelling weekend and vacation tutoring, the Company issued a false denial flatly refuting this supposed "rumor." That effort met with some success, and helped reverse a sharp decline in the Company's stock the following day. Similarly, after speaking to New Oriental senior management on June 25, 2021, Morgan Stanley analysts noted that Company "management believes even under a worst-case scenario there should still be room for adjustment" through scheduling and other changes.

25.     As Defendants misled investors about the approved regulations they knew had decimated New Oriental's core business, Company insiders unloaded millions of dollars of their personally held shares.  For example, almost immediately after the Double Reduction measures were approved on May 21, 2021, two of the senior-most executives at Koolearn—New Oriental's online division—sold over $20 million of their personally held shares in open market trades over the course of five consecutive days in highly unusual trades that were unlike any those executives had ever made before.

26.     Investors, however, were not privy to Defendants' inside information, and were damaged as the truth was revealed.  Beginning in May 2021, a series of corrective disclosures concerning the Double Reduction regulations and New Oriental's compliance failures caused the price of New Oriental's shares to decline dramatically.  For example, on May 12, 2021, news sources reported that the new regulations could ban on-campus tutoring as well as weekend tutoring—a far more severe tightening than investors had been expecting—triggering a sharp decline in the price of New Oriental shares.  On June 1, 2021, Chinese regulators announced record fines against New Oriental for "illegal acts of false propaganda and price gouging," including the falsification of the credentials for over 70% of the "Famous Teachers" featured on New Oriental's website.   And following a June 16, 2021 *Reuters* report projecting a "much tougher than anticipated crackdown," New Oriental's share price declined again—only to rebound slightly after New Oriental issued a false denial concerning the reports.

27.     Then, beginning on July 23, 2021, news reports began circulating that the new regulations would ban companies like New Oriental from offering after-school tutoring services— effectively ending the industry as it then existed in China.  While New Oriental initially sought to deny these reports as well, government regulators disclosed the full text of the Double Reduction

policy on July 25—revealing that the after-school tutoring business that accounted for approximately 60% of New Oriental's revenues had been outlawed.  In response to these disclosures, New Oriental's shares collapsed, falling 70% from $64.00 on July 22 to close at $19.40 per share on July 26.

28.     Following these disclosures, rather than answering to the Company's shareholders, New Oriental shut off investor communications for months, including by canceling its earnings release and August 3 earnings call, and refused to provide investors with any official information concerning its plans.  During that time, the Company laid off 60,000 employees and transformed the Company's business into an online food marketing platform—the first for-profit education company to announce a business switch and the transition to e-commerce following the implementation of the Double Reduction policy.  While that rapid transition enabled Defendant Yu to reclaim his billionaire status in only a year's time, it further confirms that New Oriental's senior management knew about and actively planned for the government's actions while actively concealing the truth from investors.

29.     As set forth below, Lead Plaintiff brings this action to recover the damages to New Oriental investors caused by Defendants' violations of the securities laws.

## II.   JURISDICTION & VENUE

30.     The claims asserted in this complaint arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated under Section 10(b) by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

31.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  New Oriental shares are and were listed and traded on the New York Stock Exchange during the Class Period, and many of the acts and transactions alleged

herein, including the dissemination of materially false and misleading statements, occurred in substantial part in this District.

32.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.    THE PARTIES

### A.    Lead Plaintiff

33.     Lead Plaintiff ACATIS is headquartered in Frankfurt-am-Main, Germany, was founded in 1994, and is one of Germany's leading asset managers for retail and institutional clients with more than €13.6 billion assets under management as of December 2021. As set forth in its PSLRA certification (ECF No. 27-1), ACATIS's funds purchased New Oriental ADSs on the NYSE during the Class Period and were damaged by Defendants' conduct as alleged herein

### B.    Defendants

34.     Defendant New Oriental is a Cayman Islands corporation headquartered in Beijing, China.[1] During the Class Period, New Oriental was the largest comprehensive private education company in the People's Republic of China ("PRC" or "China"). The Company principally provides after-school tutoring for students in kindergarten through twelfth grade. New Oriental went public and began listing its shares on the New York Stock Exchange ("NYSE") under the symbol "EDU" in 2006. Even before its NYSE listing, the Company operated its online services through its Koolearn brand, offering its online education programs through New Oriental's website www.koolearn.com. New Oriental listed Koolearn's shares on the HKEX in April 2019 but

---

[1] Unless noted, references to "New Oriental" also refer to its subsidiaries, including Koolearn.

remained its controlling shareholder, and continued to report Koolearn's financial results as part of its own consolidated financial results, and discussed Koolearn's business extensively on its earnings calls and other communications with investors during the Class Period. Defendant Yu is chairman of both New Oriental and Koolearn. Koolearn's results and performance were particularly important to New Oriental investors during the Class Period as the shift to online learning accelerated during the pandemic. During the Class Period, each ADS represented one share of New Oriental common stock.[2]

35.    Defendant Yu is the billionaire founder of New Oriental and served at all relevant times as the Chairman of its Board of Directors. Defendant Yu previously served as the CEO of New Oriental from 2001 to September 2016. He has been called "the richest teacher in China" and the "Godfather of English Training" for his hands-on role in spearheading the rise of private, for-profit tutoring services in China as the CEO of New Oriental. Defendant Yu is also politically connected, serving for over ten years as a Standing Committee Member of the Central Committee of the China Democratic League, the second largest political party in China, as well as a delegate to the Chinese People's Political Consultative Conference ("CPPCC"), a political advisory body responsible for "propagating policies" and to "provide explanations in case of doubt, smooth out emotions, and resolve conflict." The China Democratic League is a group of "high-level and intermediate-level intellectuals engaged in cultural education, scientific and technological work," and which provides Defendant Yu with significant political and entrepreneurial connections. In his role as a member of the China Democratic League, Defendant Yu also attended various national legislative meetings as a delegate to the CPPCC, including meetings where legislators discussed

---

[2] Effective on March 10, 2021, New Oriental implemented a one-for-ten share split, in which each common share was subdivided into ten common shares.

restrictions on the for-profit education industry. The CPPCC is a political advisory body that advises and presents proposals for political and social issues to government bodies including, most importantly, by conducting the annual "Two Sessions" meetings held every year in China. Through his roles as a high-ranking member of the China Democratic League and CPPCC delegate, and under official State Council Work Rules, Defendant Yu had access to nonpublic drafts of laws, administrative regulations, and rules, including those that were eventually publicized as the "Double Reduction" measures at the of the Class Period. Defendant Yu also serves as a Vice President of the China Association for Non-Government Education ("CANGE"), also known as the China Private Education Association, a coalition of private education companies whose purpose "is to implement the party's educational policy." As a senior leader of CANGE, Defendant Yu issued over a dozen policy recommendations for private education companies, reflecting Defendant Yu's intimate knowledge of the regulations governing for-profit education providers and the relevant policymaking process. As set forth below, Defendant Yu made representations alleged herein that were materially false and misleading and possessed material non-public information about New Oriental's and Koolearn's compliance with Chinese regulations, and the regulations adopted by Chinese policymakers during the Class Period, which rendered his statements false and misleading at the time they were made.

36.    Defendant Zhou served at all relevant times as the Company's Chief Executive Officer ("CEO") and a director of New Oriental. As set forth below, Defendant Zhou made representations alleged herein that were materially false and misleading and possessed material non-public information about New Oriental's and Koolearn's compliance with Chinese regulations, and the regulations adopted by Chinese policymakers during the Class Period, which rendered his statements false and misleading at the time they were made.

37.    Defendant Yang served at all relevant times as the Company's Chief Financial Officer ("CFO") and was named Executive President on January 15, 2021. As set forth below, Defendant Yang made representations alleged herein that were materially false and misleading and possessed material non-public information about New Oriental's and Koolearn's compliance with Chinese regulations, and the regulations adopted by Chinese policymakers during the Class Period, which rendered his statements false and misleading at the time they were made.

C.    **Relevant New Oriental Executives**

38.    Non-party Chang Sun is a non-executive director of the Board of Directors of New Oriental's online subsidiary Koolearn, formerly served as its co-CEO, currently serves as President & Director of Beijing New Oriental Xuncheng Network Technology Ltd., and is a New Oriental executive.  Before her position at Koolearn, Sun served as Vice President of New Oriental from 2016 through 2020 and Assistant Vice President of New Oriental from 2012 through 2016.  As set forth below, Sun possessed material non-public information about New Oriental's and Koolearn's compliance with Chinese regulations and the regulations adopted by Chinese policymakers during the Class Period.

39.    Non-party Qiang Yin is an executive director of the Board of Directors of New Oriental's online subsidiary Koolearn and currently serves as its CFO and a Vice President of New Oriental.  Yin has also served as Vice President of New Oriental China since April 2019 and previously served as Financial Controller and Assistant Vice President of New Oriental China from June 2005 through May 2016.  As set forth below, Yin possessed material non-public information about New Oriental's and Koolearn's compliance with Chinese regulations and the regulations adopted by Chinese policymakers during the Class Period.

40.    Because of their positions and access to material non-public information available to them, Defendants Yu, Yang, and Zhou knew, or recklessly disregarded, that material, adverse

facts alleged herein had not been disclosed to, and were being concealed from, the public, and that the representations, which were being made, were materially false and misleading. Defendants Yu Yang, and Zhou, because of their respective positions within New Oriental, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional and individual investors. Defendants Yu, Yang, and Zhou were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

41.   Defendants Yu, Yang, and Zhou are referred to as the "Executive Defendants." Defendants New Oriental and the Executive Defendants are collectively referred to as "Defendants."[3]

## IV.   BACKGROUND AND OVERVIEW OF DEFENDANTS' FRAUD

### A.   New Oriental's Business and China's Multi-Billion Dollar For-Profit Education Industry

42.   Defendant Yu founded New Oriental in 1993 as an instructional school designed to prepare Chinese students to take the TOEFL—the English language exam required for most foreign-language speakers by U.S. colleges, and the first standardized language test to be introduced to the Chinese mainland in 1981. The Company quickly became a market leader in admission test preparation courses, started English language instruction shortly thereafter, and opened its first full-curriculum primary and secondary school in 2002. After reaching a settlement with U.S. nonprofit test administrator Education Testing Service ("ETS") that accused New

---

[3] A glossary that includes descriptions of the relevant individuals, political bodies, abbreviations and defined terms referenced herein is appended to this Complaint.

Oriental of improperly using test materials and helping Chinese students to "cheat" by providing them advance test questions, New Oriental's business continued to expand rapidly.

43.    As the Company explained in its SEC filings, New Oriental grew rapidly and transformed itself into the "leading private educational service provider in China," and the "most recognized brand in Chinese private education."  Specifically, by the start of the Class Period, New Oriental offered language training courses for English and other languages, operated its own primary and secondary school, and provided study abroad consulting and study tour services.

44.    But the single most profitable and important business line for New Oriental, by far, was its "educational programs and services" segment, which delivered K-12 after-school tutoring, test preparation, and other courses.  By May 31, 2021, New Oriental operated a network of 122 schools and 1547 in-person learning centers, employed tens of thousands of teachers, and had enrolled millions of students.  According to New Oriental's Annual Reports filed with the SEC from 2018 to 2021, the educational programming and services business accounted for an overwhelming average of 84% of New Oriental's net revenues each year of the Class Period:

| (in thousands of US$ except share and per share data) | For the Years Ended May 31, | | | | |
|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2020 | 2021 |
| **Selected Consolidated Statement of Operations Data:** | | | | | |
| Net revenues: | | | | | |
| Educational programs and services | 1,608,954 | 2,165,152 | 2,785,254 | 3,230,378 | 3,936,969 |
| Books and other services | 190,555 | 282,278 | 311,237 | 348,304 | 339,570 |
| Total net revenues | 1,799,509 | 2,447,430 | 3,096,491 | 3,578,682 | 4,276,539 |

45.    Further, the fastest-growing and largest revenue driver of this business was New Oriental's after-school tutoring programs for primary and secondary compulsory school students from kindergarten through 12th grade, or K-12.  Given how much of the Company's revenue was dependent on this segment of the business, it was of particular importance to the Company's investors.  Indeed, the Executive Defendants repeatedly acknowledged this fact, describing its K-12 after-school tutoring business as the Company's "key revenue growth driver" and the lynchpin

of the Company's success, and repeatedly discussed that business line's specific programs, the drivers of its revenue growth, and other details concerning that business on every investor conference call and presentation during the Class Period.

**B.    The Growth of the For-Profit Education Industry in China**

46.    New Oriental's success and growth resulted from the Company's ability to capitalize on several trends that began in China during the 1980s. Specifically, for-profit tutoring in China emerged in the 1980s and 90s as the country began its shift toward market economies in order to become more competitive on the global stage and away from the prior centrally state-planned economy under Chairman Mao Zedong. In 1977, the Chinese government reinstated the Chinese national college admissions exam, the "Gaokao," which has been considered the crucial determinant of a Chinese student's life chances since then. Following the reintroduction of the Gaokao, entrance examinations to secondary schools were also restored.

47.    These developments, together with a government abandonment of the previously more egalitarian model and the subsequent concentration of funding and support in a small numbers of key schools, led to intense competition for children to gain admittance to these select schools. Between 1998 and early 2004, China expanded university enrolments by more than 400%, while the number of colleges and universities in China had doubled over the past decade. And with a growing economy that provided Chinese families with the financial means to purchase tutoring services, families began spending substantial sums on private tutoring. By 2004, almost three-quarters of primary school students in China had received tutoring lessons in both academic and non-academic subjects.

48.    To capitalize on this surging demand, New Oriental sought outside funding and, in 2006, became the first for-profit Chinese education service company to complete an initial public offering in the United States, raising over $100 million by listing its ADRs on the York Stock

Exchange under the ticker "EDU."  Other Chinese education companies followed New Oriental's lead, with 10 other companies listing in the United States in just four years, increasing investment and competition in the sector.

49.     Following its NYSE listing in 2006 and after expanding into after-school tutoring services in 2008, New Oriental quickly began to dominate the for-profit education industry in China.  By 2011, New Oriental boasted $460 million in annual revenues and a market capitalization of $4.7 billion, which was more than the 10 next largest U.S.-listed Chinese education companies combined.  And by the start of the Class Period, New Oriental's annual net revenue, almost completely attributable to its after-school tutoring business, totaled $4.3 billion, and was poised to increase as the Company continued to gain market share in a growing market.  As New Oriental illustrated in a "corporate fact sheet" during the Class Period, after-school tutoring in China represented an $80 billion market by 2020 and was growing an impressive 10% every year:



### C.     For-Profit Education Policymaking Under President Xi Jinping

50.     The substantial growth of the for-profit education industry during the 2000s and early 2010s invited unwanted behavior by schools and teachers that caught the attention of

government officials and policymakers.  After actively promoting private investment in education in the early 1990s, by 2016, Chinese policymakers responded to growing concerns about after-school tutoring by passing measures to regulate   content, duration, venues and teacher qualifications, among other things.

51.     These reforms were formulated and carried under the leadership of President Xi Jinping, who assumed power in China in 2012.  Under President Xi Jinping, policymaking control largely shifted away from the State Council of the People's Republic of China ("PRC"), the executive body of the supreme organ of state power, to ad hoc bodies known as Leading Small Groups, which address important policy issues on behalf of the Chinese government.  Under the Leading Small Group model of policymaking, government ministries and think tanks suggest policy ideas to the Leading Small Groups, which are led by President Xi Jinping.  Then, the leadership of the Leading Small Groups, which often means just President Xi Jinping himself, makes a specific policy decision.  The relevant government ministries then provide specific proposals to effectuate the policy decision.

52.     Throughout this process, senior officials in the relevant ministries are kept informed regarding the progress of a particular policy decision.  Often, lower-level officials in the pertinent ministries also know about upcoming changes in policy before they are announced.  For example, county and prefecture level officials in charge of education are often given the details of any new education policies ahead of the public announcement.

53.     In turn, these county and prefecture level officers often meet with market leaders in the education industry to preview new policies.  As the self-described "market leader" in the for-profit education industry, policymakers turned to New Oriental to discuss contemplated regulations before they were implemented.  Indeed, New Oriental repeatedly highlighted its access

to, and close collaboration with, government officials in connection with policy and regulatory changes impacting its business.  For example, as reflected in an October 31, 2018 report, DBS Research Group report, New Oriental highlighted its close communication with the relevant authorities responsible for enforcement of the 2018 Regulations to seek desired exemptions. Further, Defendant Yu developed relationships with party leaders through his donations to the Communist Youth League and membership in the CPPCC, the national advisory body that meets in parallel with the country's parliament, among other things.   As set forth below, this policymaking process and Defendant Yu's and the other Executive Defendants' roles and relationships with the policymaking apparatus, provided Defendants with unique, nonpublic access to policy changes before they were announced to the public.

> ### D.     Before the Class Period, the Chinese Government Begins Cracking Down on For-Profit Education Abuses

54.     Shortly before the Class Period, the Chinese government became increasingly concerned with the collateral consequences of China's test-driven environment and implemented several measures to address it.  In the government's view, Chinese students were being overworked due to the combination of long school days and hours of after-school tutoring, with children often in classes from 7 a.m. until almost midnight.  These burdens were compounded by abuses by for-profit educators that were seen as exploiting parents' anxieties through false and misleading advertising.

55.     In one prominent example, New Oriental was singled out for falsifying the qualifications of the "Famous Teachers" who helped promote the Company's Bubble English Schools.   Specifically, an August 2017 investigation by the China Business News, whose journalists attended New Oriental training sessions posing as hopeful hires for the Company, revealed that New Oriental's teacher trainers encouraged its teachers to lie about their

qualifications and experience.  For example, one new hire without any teaching experience was labeled a Famous Teacher who had been "engaged in English teaching for young children for many years."   The article suggested that New Oriental was not alone, that exaggerated teacher qualifications was an "unspoken rule" in the industry, and that increased oversight of tutor credentialing was needed.[4]

56.    At the time, New Oriental and Defendant Yu promised to immediately rectify the misconduct the journalists uncovered, and represented that the Company had implemented measures to ensure the Company comprehensively verified teachers' information.  In a statement published on his personal account, "Old Yu Gossip," Defendant Yu described the behavior uncovered in the article as deeply shameful to New Oriental and committed to rectifying the situation.  According to Defendant Yu, "New Oriental strictly prohibits exaggeration, fabrication and falsification of teacher information in any form and on any occasion."

57.    Following increasing numbers of reports like these, beginning in February 2018, the Chinese Ministry of Education—an agency of the State Council that regulates all aspects of the education system—together with several other government agencies, implemented a series of measures to enforce oversight of the after-school tutoring industry and rein in abuses that were perceived as detrimental to student welfare.  The first such measure, called the *Notice on Practically Reducing Primary and Secondary School Students' After-school Burdens and Conducting Special Campaign on After-school Tutoring Institutions*, required the Ministry of Education to inspect private tutoring institutions and review their practices, and issued additional

---

[4] Lead Plaintiff has endeavored to ensure accurate translations of statements, documents, and other material originally appearing, communicated or transmitted in Chinese.

guidelines to these institutions.  These inspections, performed by four major bodies of the Chinese national government, focused on four areas: safety, licenses, content, and competition organizing.

58.    As New Oriental described them its 2018 Annual Report, in addition to improving inspections, the February 2018 regulations "prohibit[ed] after-school tutoring institutions from providing courses more advanced than the syllabus and curricula applicable to the respective primary and secondary school students or courses focusing on enhancing students' exam-taking skills," as well as "linking tutoring results at after-school tutoring institutions with the enrollment of primary and secondary schools."

59.    In other words, the February 2018 regulations attempted to curtail the ever-increasing competition among students, who were constantly pushed to graduate more quickly to advanced subject matter; curtail excessive tutoring fees and reduce the educational disparities between the wealthy students whose parents could afford to pay for hours of after-school tutoring and those who could not; and to otherwise improve the quality of after-school tutoring programs.

60.    These new regulations and additional efforts aimed at the "academic burden reduction" were a significant topic of discussion at the annual "Two Sessions" parliamentary meetings in March 2018—the most significant annual political event in China, where party leaders meet to discuss priorities and set the year's political agenda.  For example, at the meeting on March 5, 2018, Li Keqiang, the Premier of the Chinese government and second most powerful political figure in China, vowed that the government would "spare no effort to resolve the heavy workloads of primary and secondary school students."

61.    At the 2018 Two Sessions, which Defendant Yu attended as a CPPCC delegate, Defendant Yu publicly defended private institutions' role, stating "Private training institutions should not be blamed, because they are an important supplement to the education system."  Rather,

Defendant Yu said, the way to address these burdens was to ensure that the pressure was moderate. As reported in Chinese news media, Defendant Yu later explained in a March 2018 report that "Nurturing a child is like planting a tree. Although a large amount of fertilizer can make the tree grow quickly, it will grow morbidly later, just like lots of 'young geniuses' in China who turn out to be ordinary when they grow up." If anything, Defendant Yu placed the blame on public school teachers that mandated student enrollment tests, which had been ostensibly outlawed in certain cities in 2013 but still secretly implemented by school officials.

62.    Following the announcement of the February 2018 regulations, Defendant Yu helped lead an effort by 160 after-school tutoring institutions to sign an agreement at a CANGE conference in Zhengzhou, Henan. In that agreement, the tutoring providers committed, among other things, to forbid the use of exaggerated advertisements to lure students to tutoring classes, to, avoid "extra-syllabus" teaching, and promised to take other measures to improve the quality of instruction. Defendant Yu delivered a keynote speech at that conference in which he urged for-profit providers to fully support and actively respond to the spirit of the new regulations, to promote industry self-discipline and a positive industry image, and to act with integrity.

63.    The efforts to reduce the perceived burdens imposed by after-school tutoring were further addressed in measures announced on August 22, 2018, when the Chinese State Council issued supplemental guidelines in its *Opinion on Supervising After-School Tutoring Institutions*, known as "Circular 80." The Circular 80 guidelines provided detailed restrictions and mandates on for-profit tutoring providers, including—perhaps most importantly—the requirement that teachers employed by for-profit institutions obtain the necessary teaching qualifications. The Circular 80 reforms were described in the Company's 2018 Annual Report as follows:

> The State Council Circular 80 provides, among other things, that (i) the average available-for-use area per student must be no less than three square meters within

the same training hours; (ii) private school shall purchase safety insurance for training participants; (iii) no in-service school teachers shall be hired by after-school tutoring institutions and all the teachers for Chinese, math, English, physics, chemistry and biology courses in after-school tutoring institutions shall obtain relevant teaching qualifications; (iv) the content, classes, enrollment targets, progress and school hours of courses like Chinese, mathematics, English, physics, chemistry, and biology shall be filed with the local education authorities and be made public; (v) the training courses offered to primary and secondary school students shall not be more advanced than the syllabus and curricula applicable to them; (vi) no tutoring courses shall be given after 8:30 p.m., and no homework from after-school institutions shall be allowed; (vii) no grade examination, competition or ranking in connection with the subjects of primary schools or middles schools shall be organized, and no class shall be arranged in conflict with the hours of regular schools, and (viii) no advance tuition fees of more than three months may be collected.

64.     Underscoring the importance of ensuring appropriate teacher qualifications, on August 31, 2018, the Chinese government issued the *Notice of the General Office of the Ministry of Education on an Overhaul of Practically Administering After-school Tutoring Institutions*, which required that tutoring institutions publicize their teachers' name, photo, class, and qualification certificate number on their official websites and tutoring venues, and barring tutoring firms from retaining teachers who had not passed the government's qualification test by the second half of 2018.  Then, on November 20, 2018, the general offices of the Ministry of Education, State Administration for Market Supervision, and the Ministry of Emergency Repose Management issued the *Notice on Establishing a Robust Working Mechanism to Rein in After-school Tutoring Institutions*, which further emphasized the supervision of tutoring institutions without a proper license or qualification. This notice further incorporated and applied rules developed in the February 2018 Regulations to online education providers.

**E.     Following the After-school Tutoring Crackdown and the Implementation of the 2018 Regulations, New Oriental Assured Investors Concerning Its Compliance with and the Benefits It Obtained from Government Scrutiny**

65.     By the end of 2018, the regulatory framework governing private after-school tutoring was substantively complete.  At the time, New Oriental claimed its implementation was a

resounding success, and that the Company's investors would benefit from increased government scrutiny into the industry.  For example, during an October 2018 earnings call, analysts pressed the Company on the impact of the new regulations, and New Oriental executives were unequivocal that they would benefit the Company.  Defendant Yang responded to an analyst's question about the regulations' impact by explaining that, "as a leading education provider, <u>absolutely we fully support the government reforms</u>," which Yang claimed actually represented a "<u>great opportunity</u>" for New Oriental "<u>to take more market share from the small players</u>."  In fact, Defendant Yang represented, the new regulations had <u>already had</u> a positive impact on the Company's enrollment figures:

> So I think this is an opportunity for us to take more market share from the small players. Maybe you would have read some news historically, some small players, they can do the business in the proper way, and <u>we have seen some students in the last six months, the students from the small players originally to join our classes. So this is what we have seen in the last six months. And I think it's just a great opportunity for us.</u>

66.    New Oriental continued to tout the supposed "benefits" of the 2018 Regulations as they were finalized and fine-tuned throughout the Class Period, and as government agencies reported on the industry's compliance.  For example, on January 17, 2019, the Ministry of Education reported that government inspections had found that, by year-end 2018, "2,963 counties (cities, districts) across the country have started special governance and rectification work, of which 2,758 counties (cities, districts) have basically completed the tasks of special governance and rectification, and the completion rate of counties (cities, districts) is 93.08 %."  According to the Ministry of Education, "there [we]re 401,050 off-campus training institutions nationwide, 272,842 institutions with problems, and 269,911 of which have completed rectification, with a rectification completion rate of 98.93%."

26

67.    Several days later, on the Company's second quarter earnings call, analysts asked about updates to New Oriental's compliance measures, and Defendant Yang again touted the Company's work in meeting the new government standards.  For example, Defendant Yang specifically referred to the government's "city-by-city" review conducted by the Ministry of Education, and represented that the "company is firmly supportive of these reforms," that the impact from the regulations was "in line with our expectations," and that the Company had worked to meet them by standardizing its teacher training process and by pushing its teachers to pass the teacher licensing exams and gain the required licenses.  According to Defendant Yang, the Company saw "high passing rates for the last [teacher qualifications] exam," and would "ensure all the teachers hold their qualifications as required."

68.    According to Defendant Yang, New Oriental's superior market position and compliance record enabled New Oriental to take market share from competitors, and the Company would continue to gain market share because New Oriental conducted its business in the "proper way":

> Yeah, we are seeing some small players were kicked out of the markets by the new regulations.  And we have seen certain students including us because some students tell us.  <u>And I think our job is to doing our job in a proper way. We will provide the best quality services to the parents and the students.</u>  And we're happy to see the highest student retention rates. I think this is very good, the results of the – of our investments for the last two years to three years. And I think the market demand is always there and we will do it in a proper way is always there.

69.    New Oriental assured investors that it complied with the 2018 Regulations' core requirements by the beginning of the Class Period, and continued to do so throughout the Class Period.  And although the Chinese government continued to fine-tune the mandates set forth in the 2018 Regulations, including by applying their standards to online programs, the new rules were effectively finalized by the end of 2018—and analysts credited New Oriental's representations that the Company satisfied them.  For example, UBS analysts reported that during an October 30, 2018

meeting with New Oriental executives, Company management "struck a positive tone on regulations," noting that New Oriental represented that, "on course materials, EDU's materials are compliant with school curriculums," that all New Oriental teachers had been enrolled for licensing exams and were expected to have high pass rates because "EDU's internal exams are more difficult," and that the Company had seen "students from these closed-down institutions [come] to us."

70.    Similarly, in addressing the new regulations in an October 31, 2018 report, analysts from DBS Group dismissed "market worries" about negative revenue impacts due to the regulations. Rather, the analysts concluded that, as an "industry leader, New Oriental is already doing well on license, teaching content, and classroom area," that "the company has already obtained all licenses required for its training centres," and on "teaching content, it also meets the requirements." And as UBS analysts noted in a January 3, 2019 report, by that time, the "requirements/policy framework [is] mostly complete," and the "special inspection campaign finished by end-2018 and most necessary fixes for EDU done."

71.    New Oriental continued to tout its compliance with the 2018 Regulations throughout 2019 and 2020, highlighting its K-12 after-school tutoring programs as the Company's key revenue and growth driver in every single earnings release and investor call. For example, during a July 23, 2019 earnings call, Defendant Yang stated that New Oriental "fully support[s] the government reforms and implementation," "continue[s] to comply with the regulatory requirements closely and cooperatively," and "do[es] not foresee any material impact from the regulations." As Defendant Yang explained in response to an analyst's question, rather than viewing increased government scrutiny as a negative:

> [W]e fully support of the regulations from the government because I think it's good
> for the whole industry. And so, we're doing our jobs to provide better service to the

students and to provide better products and to give the better feedback from the parents and kids. So, this is our target. So, I think this is a good timing for us to take more market share by providing the better product. So, this is our attitude to the policy.

72.    New Oriental's statements to investors were critical to their evaluation of the Company's shares and analysts relied on New Oriental's detailed representations regarding compliance, often parroting back the Company's claims verbatim in their reports.  For example, in a March 13, 2019 report, Credit Suisse analysts noted that New Oriental "complies with government requirements with online education following the standard in offline,"  Morgan Stanley agreed in June 14, 2019 report that New Oriental was "in compliance with regulation requirements and should benefit from market consolidation," while DBS Group Research analysts noted in a July 25, 2019 report that New Oriental "complies with government guidance and policy on regulating AST institutions."

**F.    New Oriental Takes Koolearn Public in Hong Kong to Capitalize on Its Inflated Valuation**

73.    Taking advantage of an inflated valuation based on Defendants' false representations, New Oriental took its online subsidiary, Koolearn, public by listing its shares on the HKEX on March 28, 2019.  In doing so, New Oriental raised $226 million after deducting underwriting fees and expenses.  Following Koolearn's listing in Hong Kong, New Oriental remained its controlling shareholder with an over 50% equity interest, and Koolearn's financial results continued to be consolidated into New Oriental's financial records.  Throughout the Class Period, Defendant Yu served as chairman of both companies, and exercised substantial control over all aspects of Koolearn's business and operations.

74.    The Koolearn online business was a critical part of New Oriental's long-term growth.  As Koolearn explained in its Annual Reports, its online platform and services are sold under the "New Oriental" brand name, and its relationship with New Oriental was key to its

success. Executives of both companies referenced Koolearn's online capabilities, business strategies, and marketing efforts as critical to New Oriental's business and results. For example, in discussing Koolearn's Hong Kong listing in an April 2019 earnings call, Defendant Yang explained that New Oriental's goal for Koolearn was to tap into the "market opportunity in the pure online education space," with investments in recruiting and training, sales/marketing, R&D and other strategic investments, New Oriental was "able to reach more students in low-tier cities in an interactive and scalable approach" to boost the Company's "top line growth." Along similar lines, in an August 21, 2020 earnings call, Koolearn CEO Sun Dongxu explained how Koolearn's results benefited from the "well established brand of New Oriental," and that the subsidiary had "inherited the excellent DNA from New Oriental." In another example, in discussing Koolearn's 2020 fiscal year fourth quarter results, CFO Yin stated "The cost of acquiring customers for New Oriental Online [Koolearn] is not high. . . . This is mainly based on the brand influence of New Oriental Group, which has enabled it to obtain a huge traffic pool of current students during the epidemic, and this traffic pool will continue to contribute new paying users to New Oriental Online." And in a March 20, 2019 interview, Yin described his close relationship with Defendanbt Yu, stating that Koolearn had "the genes of New Oriental" and that he was "very grateful to Mr. Yu for his trust in me, and I have lived up to his expectations."

75.     Defendant Yu maintained close contact with senior Koolearn executives, including Sun and Yin, during the Class Period, and Koolearn senior executives were intimately involved in monitoring and responding to the developments concerning government regulations impacting New Oriental's business. Indeed, as part of the joint business operations between New Oriental and its Koolearn subsidiary, Defendant Yu, Sun and Yin personally approved millions of dollars in expenditures and sales of New Oriental products and services during the Class Period in their

capacity as board members, and did so only after evaluating and determining whether those expenditures were appropriate in light of business needs and the impact of government regulations. New Oriental senior executives, as well as Defendant Yu, Sun, and Yin, also regularly discussed the impact of government regulations related developments during New Oriental's board of directors meeting on January 21, 2021, the Koolearn board of directors meeting Yu, Sun and Yin attended on January 22, 2021, and in formulating and responding to media inquiries concerning New Oriental's and Koolearn's business plans and operations, such as news inquiries concerning massive layoffs in April and May 2021.

76.     Further, the overlap and shared business operations between the two companies is evidenced by the fact that most Koolearn employees and board members—including New Oriental executives Yin and Sun—had long careers at other New Oriental divisions before transitioning to positions at Koolearn.  Moreover, the Company's operations were effectively inseparable, and New Oriental regularly discussed Koolearn's performance in its public filings and on conferences with investors during the Class Period.  Thus, the market looked to New Oriental for information regarding Koolearn, and vice-versa.

### G.    New Oriental Quickly Rebounds After the Onset of the Pandemic, Grows Its Online Business, and Conducts a Global Offering While Falsely Claiming the Company Had "Never Been Penalized" for Violating Regulations

77.     Defendants' representations about the Company's compliance with the 2018 Regulations and the impact of increased scrutiny of the for-profit tutoring industry had their desired effect, with New Oriental shares nearly doubling in price from the beginning of the Class Period until mid-January 2020, when the outbreak of COVID-19 pandemic in China shut down offline schools.  As a result of the pandemic, Koolearn's importance to New Oriental investors took on heightened significance as the pandemic drove an increase in the demand for Koolearn's online platform and services, which New Oriental exploited during the Class Period.

31

78.    While New Oriental shares initially declined at the outset of the pandemic—together with the broader equity markets and other businesses similarly impacted by COVID-19—New Oriental ADSs quickly rebounded.

79.    In fact, based on Defendants' representations, analysts viewed the onset of the pandemic as a positive for the company.  Instead of presenting a risk, analysts concluded that New Oriental would be able to withstand the short-term disruption in operations and cash flow caused by the pandemic (whereas smaller competitors would not), and that the pandemic's effects would lead to a further tightening of the competitive after-school tutoring industry that benefitted New Oriental.  For example, in a February 28, 2020 report, JPMorgan analysts concluded that the pandemic would benefit the Company as it would likely "force smaller players out of the market, in turn further accelerating industry consolidation which was already well-underway since last year due to stricter regulations."

80.    Throughout this time, New Oriental continued to reassure investors that it fully complied with the 2018 Regulations while operating during the pandemic.  For example, on October 23, 2020, New Oriental filed a Form 6-K with the SEC where it stated that "Since the promulgation of the State Council Circular 80, our training schools have passed the annual inspections conducted by the education authorities and we have never been penalized for reason of tutoring content violating the State Council Circular 80 or the Tutoring Negative List."

81.    By November 2020, the price of New Oriental's ADSs had recovered from their initial pandemic-induced dip, and had tripled in price since the end of 2018.  Defendants took advantage of this by conducting a $1.3 billion global common stock offering that would enable the Company to list its shares on the Hong Kong Exchange.  In connection with the offering, Defendants made a series of representations concerning the Company's compliance with the 2018

Regulations, telling investors that the Company's primary "value proposition" was providing students with "[a]ccess to high quality teachers," and that it complied with the regulations governing its business.

82.    This deception was hugely successful.  The public offering was oversubscribed, and raised over $1 billion for New Oriental.  Unknown to investors, however, at the same time that New Oriental conducted this offering, it was violating the core regulations governing after-school tutoring programs in China and putting the Company at grave risk.

**H.    In Truth, New Oriental Secretly Engaged In Illicit Schemes To Boost Student Enrollments and Revenues**

83.    Defendants' representations that the Company was "fully supportive of the government's reforms and in their implementations," maintained "strict" compliance, and that such regulations would not have "any material impacts on [New Oriental's] top line," were false.  In reality, fraudulent practices in violation of the 2018 Regulations were a key feature of New Oriental's business.

84.    As would be later revealed at the end of the Class Period, rather than "strictly" complying with government regulations, New Oriental engaged in the core misconduct targeted by the Circular 80 regulations.  For example, New Oriental falsified and exaggerated its teachers' qualifications in advertising its after-school offerings.  New Oriental also misrepresented the true cost of its services by offering misleading discount schemes designed to trick customers into believing they had received a non-existent discount.  New Oriental also flouted national curriculum standards designed to standardize its offerings and regulate its promotional materials.  Specifically, and as set forth in detail below, New Oriental engaged in the following misleading practices:

(a)    New Oriental falsified and exaggerated teacher credentials to entice students.  The Company misrepresented its teachers' experience and subject matter expertise to make them appear more reputable and to incentivize prospective students to sign up for New Oriental's services.  Indeed, the

Chinese Market Supervision Bureau found that nearly 74% of the teachers on the "Famous Teachers" section of New Oriental's website contained falsified qualifications "inconsistent with the facts"—a striking finding particularly in light of New Oriental's professed commitment to ensure this precise type of "shameful" misconduct never happened again.

(b)    The Company engaged in price gouging to hide the true cost of its programs. New Oriental hid the true cost of its products by advertising certain services at a purported "discount" from an original price when, in fact, such services had never been sold at that original price. New Oriental also charged fees for periods in excess of regulatory limits.

(c)    New Oriental used deceptive advertisements and promotions to mislead customers about the content and nature of its programs. New Oriental failed to publicize course information necessary for students to assess the value of the Company's offerings. To induce students to sign up for the Company's services, New Oriental also made improper referrals using the images of research and academic institutions, among others. New Oriental also failed to adhere to national curriculum standards as required.

85.    New Oriental's illegal and deceptive practices had a material, undisclosed effect on the Company's business and results and invited severe regulatory sanctions. In fact, while unknown to investors during the Class Period, New Oriental was repeatedly targeted and penalized by national and provincial regulators for its noncompliance during the Class Period, often receiving the maximum possible fines under the law. New Oriental's noncompliance during the Class Period exposed the Company to increasing scrutiny from national and provincial regulators and exposed New Oriental to severe sanctions, including those that ultimately culminated in the "Double Reduction" measures disclosed in July 2021 that banned for-profit tutoring.

### 1.    New Oriental Falsified Teacher Credentials for Over 70% of the "Famous Teachers" It Featured on Its Website

86.    New Oriental's core business depended upon increasing student enrollments, and the factors driving New Oriental's reported enrollment growth were addressed on every single earnings release and investor call during the Class Period. For example, New Oriental told investors that it increased enrollments by employing legitimate measures, including "all kinds of

the operational actions to boost the enrollment and classroom utilization," improving its teacher training, and marketing and word-of-mouth advertising that capitalized on New Oriental's brand.

87.    In reality, New Oriental fraudulently boosted student enrollments by lying about its teachers' qualifications—including by fabricating the credentials of over 70% of the "Famous Teachers" the Company featured on its website.

88.    Specifically, as Chinese regulators concluded following an investigation that was disclosed at the end of the Class Period, New Oriental falsified the teaching experience of over 70% of its instructors on the "Famous Teachers" section of its website. For example:

(a)    "Zhou Moumou 3 years of teaching experience" – based on their teaching qualification certificate, Zhou Moumou's real teaching experience was only1 year and 6 months;

(b)    "Zhang Moumou 3 years of teaching experience" – based on their teaching qualification certificate, Zhang Moumou's real teaching experience was only five months; and

(c)    "Liao Moumou 6 years of teaching experience" – based on their teaching qualification certificate, Liao Moumou's real teaching experience was only 2 years.

89.    Indeed, of the 103 teachers listed on the "Famous Teachers" section of New Oriental's website, 76 teachers had profiles with falsified credentials and teaching experience as of May 20, 2021 – or nearly 74% of all instructors advertised as "Famous Teachers."

90.    During the Class Period, New Oriental's website also featured many teachers with fake grade-level credentials. For example, a teacher surnamed Huang (registered with the Ministry of Education under teacher certificate number 20073757231000047)[5] was qualified as a junior high school teacher. However, the Teacher Qualifications Office of New Oriental University

---

[5] The Ministry of Education implements a national unified numbering method for the public to assess teacher qualification certificates.

displayed his credentials as "Senior High School Teacher Qualification" and indicated that he was qualified to teach high school courses. Similarly, a teacher surnamed Liu from Youneng Middle School (teacher certificate number 20063420330000174) taught mathematics for grades 1-3, but was only qualified as a junior high school teacher.

91.     New Oriental also falsified its instructors' subject matter expertise – or lack thereof – to drive enrollment. For instance, regulators determined that in 2021, out of the 20 instructors responsible for a New Oriental biology course (two lecturers and 18 classroom supervisory teachers), only three actually held biology teacher qualification certificates, and one of them was an online lecturer on biology and geography without a teacher qualification certificate; another instructor for the course, Ye Mouxiang, had no teaching qualifications.

## 2.     New Oriental Used Deceptive Advertising to Hide the True Costs of Its Programs

92.     During the Class Period, New Oriental also employed misleading sales practices to hide the true cost of its services and trick customers into believing they had received legitimate discounts to drive enrollments. Specifically, New Oriental and its Koolearn division tricked customers by advertising that their services were offered at a significant discount to a fictitious original price that had never actually resulted in a single sale. In other words, New Oriental advertised so-called "discounted" prices for courses that had never been sold at the claimed original price, thereby greatly exaggerating any supposed "discount." As would only be revealed at the end of the Class Period, New Oriental's misleading promotions included:

(a)     In April 2021, one online New Oriental training course was marketed with a sales page that displayed a so-called "preferential promotion": "¥2160, ¥199 after discount." However, the course had never been sold for the purported "original" price of ¥2160.

(b)     New Oriental advertised the training course "Grade 4 to 6 English Grammar" at a cost of 1 yuan and ~~199 yuan~~ (10 lessons). New Oriental never sold this course at the stricken price point.

(c)　New Oriental's promotional materials for its December 2020 course entitled "Summer Holiday New Year's Day Accompanying Plan" included a fictitious "original price" to trick customers into thinking they were getting a discount.

(d)　New Oriental's promotional materials for a March 2021 course entitled "New Third Grade Huixue Class" included a fictitious "original price" to trick customers into thinking they were getting a discount.

(e)　New Oriental advertised the training course "Masters in the United States will take you around the world to learn English" at a cost of 1 yuan and ~~199 yuan~~ (5 lessons).  New Oriental never sold this course at the stricken price point.

93.　Outside of these "fake discount" schemes, New Oriental also charged fees for its courses beyond the three-month limitation imposed by Circular 80.  As ultimately revealed near the end of the Class Period, Beijing municipal regulators identified New Oriental and its Koolearn division as "repeatedly" violating the Circular 80 regulations, including by charging one-time or disguised fees in excess of three months or 60 class hours.

### 3.　New Oriental Used Deceptive Promotions To Mislead Its Customers About The Content And Nature Of Its Programs

94.　New Oriental also engaged in other deceptive promotions to mislead customers about the quality and value of its programs, including by enlisting recommendations or referrals in the name of, or using the image of, research institutions, academic institutions, education institutions, industry association, professional specialists or beneficiaries—another practice targeted by the 2018 Regulations.  For example, as would be revealed at the end of the Class Period, the Beibei Campus of Chongqing New Oriental Training School failed to comply with several key aspects of the regulations by:  (i) failing to publicize disciplinary record information; (ii) failing to publicize class cards as required; and (iii) providing inaccurate information, including listing training teacher information on the bulletin board was inconsistent with the teacher roster.  And in May 2021, regulators determined that Private New Oriental School in Haidian District,

Beijing and Beijing Chaoyang District Private New Oriental School similarly failed to comply with the basic requirements of the regulations and impermissibly provided teaching content that exceeded corresponding national curriculum standards.

**I.    New Oriental Senior Executives Learn of the Government's Policy Shift But Falsely Misrepresent the Company's Compliance, the Outcome of the "Two Sessions" Deliberations, and the Impact of the Pending Regulations**

95.    New Oriental's undisclosed violations influenced policymakers who became increasingly concerned that the 2018 Regulations failed to rectify perceived abuses in the after-school tutoring industry.

96.    Beginning in January 2021, high-level policymakers and provincial leaders in China began to publicly address perceived abuses in the after-school tutoring industry.  The executives at New Oriental, the self-proclaimed "market leader" that was secretly and repeatedly violating the 2018 Regulations, knew these official public warnings signified a momentous shift in the government's stance on for-profit after-school tutoring.  Defendant Yu, in particular, was made aware of the shift in official policy through his role as a delegate and Standing Committee Member of the Central Committee of the China Democratic League, one of China's political parties, and as one of—if not the most—prominent public figures on for-profit education in China.  But rather than disclose the truth about the impending crackdown, New Oriental and Defendant Yu made a series of misrepresentations to conceal New Oriental's misconduct and the changes in government policy that would shut down the for-profit after-school tutoring industry.

97.    First, in January 2021, the Communist Party's Central Commission for Discipline Inspection (the "CCDI"), the highest internal control institution of the Chinese Community Party, criticized the expansion of off-campus online tutoring, highlighting problems such as misleading advertising and arbitrary charges, and calling for strict supervision of the industry.  In particular, the CCDI published an article criticizing the industry in striking terms, specifically calling out the

online education sector for creating a "capital whirlpool," where "the quality of courses and teaching effects to gain market choice and favor, but is gradually dominated and influenced by capital."

98.    Second, on February 4, 2021, just weeks after the CCDI's comments, the Minister of Education released a speech stating that the Ministry was seeking to "reduce the burden on students and their families by having stricter supervision of the after-school tutoring market in a bid to free students from endless after-school classes and curriculums." According to the speech by Minister Chen Baosheng, there was an "urgent" need to "proactively" "rectify mercenary behaviors, subject training, wrong speeches, anomie of teachers' morality, and false advertisements." While analysts and investors at this time assumed that, at worst, minor regulations might be implemented, New Oriental understood—including due to Defendant Yu's inside access—that the Company's business was in grave jeopardy.

99.    Third, Defendant Yu and New Oriental Board member Robin Li attended the Two Sessions parliamentary deliberations on March 8-11, 2021 where President Xi made clear to attendees the policy shift that would dismantle private after-school tutoring. Specifically, at the 2021 Two Sessions—the major annual political event in China for party delegates to discuss major policy decisions and set the central government's political agenda for the coming year—China's President Xi offered unusual and damning criticisms of the after-school tutoring industry. In striking terms, President Xi described the business as "chaotic," a "stubborn disease that is difficult to manage," and decried the negative impact after-school tutoring had on both students and parents, saying that the problem "can't be solved by the education authority alone, and all social aspects and related departments should make joint efforts to study and solve it." The online education

sector in particular was singled out during the Two Sessions for charging "high fees," among other "unhelpful conditions."

100.    Delegates to the Two Sessions and other government officials seemingly picked up on President Xi's comments.  For example, in an interview with *Beijing News* on March 8, 2021, a CPPCC delegate and deputy director of Shanghai's municipal educational commission, proposed various regulations to be implemented in Shanghai.  The following day, Tsinghua University News published a proposal from another CPPCC member that suggested a ban on any after-school tutoring company providing courses in Chinese, Math, English, Physics, or Chemistry.  Likewise, *Caixin Global* reported that "Multiple representatives raised concerns that seven-days-a-week extracurricular classes hurt children's physical and mental health. Some even suggested a ban on tutoring institutions."

101.    Then, on March 10, 2021, news surfaced that two offices within the Beijing Ministry of Education produced a document demanding that all academic-based and language after-school training be suspended.   Specifically, after President Xi's comments, Beijing educational authorities ordered all in-person training classes—which were suspended in mid-January amid a resurgence of COVID-19 cases—to postpone reopening and conduct inspection and rectification.  As *Caixin Global* reported:

> According to a checklist circulated online, Beijing authorities are conducting inspections of all in-person after-school education institutions, involving qualification of teachers, tuition management, advertising, forms of contracts and pandemic control measures. Any institution has to go through two rounds of inspections and meet all requirements in the checklist before they can reopen, Chu Feng, chief executive of a Beijing K-12 training company told Caixin.

> This round of inspections is particularly focusing on business licenses and qualifications, Chu said. Even if a parent company owns an education service business license, each of its branches and campuses has to pass the checklist separately. For large companies with hundreds of sites, it could take quite some time for full compliance.  None of New Oriental's campuses has opened, according to Chu.

102.    News outlets also reported on other rumors that "education authorities in parts of Beijing and other areas planned to continue a ban on 'offline training and group activities,'" although the details of these measures were unclear and unverified.

103.    As an official delegate of the China Democratic League, Defendant Yu attended the March 2021 Two Sessions and was in attendance for discussions regarding the for-profit education industry.  According to news reports, Defendant Yu "did not publicly defend the off-campus tutoring market" during the Two Sessions.  Rather than argue in favor of the industry he led, Defendant Yu's remarks were focused on promoting the use artificial intelligence to help English education in rural areas.

104.    Investors failed to appreciate the significance of Defendant Yu's silence, which stood in stark contrast to his typical practice during the annual Two Sessions meetings.  In prior years, Defendant Yu had been a prolific and vocal advocate for education policy reforms.  For example, Defendant Yu submitted almost 30 proposals regarding education equity, education informatization, college entrance examination reform, and private education in 2020, and spearheaded similar efforts in prior years.  As investors could not appreciate, however, Defendant Yu recognized that there was no use in publicly objecting, as the policy to ban for-profit tutoring had already been established by President Xi.

105.    On March 11, 2021, as the Two Sessions closed, reports of a looming "regulatory storm" focused on the after-school tutoring industry began to intensify, with some news sources reporting that "the recent crackdown might be more severe than ever."  On March 31, 2021, the Ministry of Education announced a measure to limit the amount of online learning for primary and secondary school students, addressing another concern about children's welfare at the Two Sessions.  That same day, the Chairman of CANGE delivered a speech regarding the online

41

education industry, during which the Chairman "suggested companies to proactively transform their business models and extend services to other segments"—a striking comment from an industry lobbying group that confirmed the government policy change for New Oriental.

106.    As would only be revealed after the Class Period, that same month, in March 2021, representatives from New Oriental and other after-school tutoring giants met directly with officials from China's Ministry of Education. At the meeting, New Oriental executives were told that instructional materials and content would be treated as publications—subject to advanced censorship by the government—among other, more stringent oversight measures. This high-level meeting with the most senior education body in the country was another unequivocal confirmation concerning the impending crackdown.

107.    Indeed, at the same time that New Oriental representatives were meeting with Ministry of Education officials about their program content and told by a leading industry lobbying group leader to "transform their business model," New Oriental was doing just that. For example, beginning in March 2021, New Oriental's online division began laying off approximately 20% of its employees, focused on teachers in primary and secondary schools and operations—a clear confirmation that New Oriental understood the shift in after-school tutoring policy and was then taking drastic steps in anticipation of the Double Reduction ban on for-profit tutoring.

### J.    New Oriental Falsely Reassures Investors About the Double Reduction Policy and Claims the Government Crackdown Will Benefit the Company

108.    Although New Oriental internally recognized the significance of state officials' public pronouncements and President Xi's attack on what he termed a "stubborn disease," Defendants publicly dismissed any concerns over increased government scrutiny. Instead, Defendants misled investors into believing that there would be no additional government regulations, or that any new regulations would actually benefit New Oriental.

109.    For example, shortly after the CCDI's criticisms of the abuses in the after-school tutoring sector, on January 24, 2021, Defendant Yang appeared on Bloomberg Markets and specifically addressed concerns over new government regulations.  But when asked about the "key concerns when it comes to regulatory challenges" and the "other additional regulations that you see potentially in the pipeline," Defendant Yang highlighted New Oriental's position as a "market leader," told investors the Company had "performed very well to meet the new requirements from the government" imposed by the 2018 Regulations and that, "so far, we don't anticipate any new regulations from the government."

110.    Similarly, after news reports emerged that New Oriental's online division had engaged in "mass layoffs," in April 2021, the Company falsely dismissed those claims as rumors, publicly stated that it was "not planning to fire many employees," and claimed the reported 20% reduction was incorrect, that the firings were not a "centralized layoff action," but instead simply reflected an ordinary course "quarterly optimization."

111.    In fact, in directly addressing concerns over President Xi's comments at the Two Sessions and the recent actions by Beijing officials, New Oriental told investors that any new regulations would benefit the Company.  Specifically, during the Company's earnings call on April 20, 2021, a UBS analyst highlighted the recent and "relatively strict comments on the after-school tutoring regulations," and asked New Oriental to "share some color about [its] take on potential regulation direction."  Defendant Yang replied:

> Actually, the government's intention to tighten after-school tutoring business policy is not a surprise to us.  As you know, it has been discussed for a long time, since 2018.  And we believe the regulations efforts will foster a positive environment for the whole market to improve the market standard and enhance the average teaching quality of the whole market. And I think we are aligned with the government policy and also full – and fully committed to work together with the government to build a better – the education market in China.

I think the reform details are yet to be announced.  So now, we are unable to provide a full analysis on our business impacts.  <u>But at this stage, we do not foresee any material impacts on top line.  And we do expect some – the admin cost may increase in short-term to meet the new requirement.</u>

As the largest provider, New Oriental, I think we are – we have the strong capital to be compliant with the potential reform, the policy reform.  And at the same time, we expect that China's after-school tutoring market to further be consolidated.  And we have been in preparation for this and we're ready to further take more market share from the other players

112.    Further, in response to specific reports that regulators had initiated inspections that uncovered violations of the 2018 Regulations, New Oriental falsely denied that it had engaged in any misconduct.  For example, in response to an investigation by journalists at ChinaNews.com who had uncovered that New Oriental had falsified its teacher qualifications published on April 23, 2021, New Oriental falsely denied it engaged in any misconduct and instead claimed "<u>there was no fraud in the qualifications of teachers, and all teachers at the corresponding stage taught the corresponding course.</u>"  In another instance, in May 2021, after reporters from *Reuters* questioned New Oriental on reports that government regulators had pulled New Oriental advertisements from national television outlets, the Company denied that it had purchased any.

113.    Analysts credited New Oriental's assurances.  For example, on April 21, 2021, analysts from CMS claimed that New Oriental "had a strong track record of compliance, which should help it to navigate upcoming policy challenges" and asserted that the "consolidation trend" that New Oriental previously assured investors would benefit the Company remained "unchanged."  Likewise, Credit Suisse analysts agreed that "market consolidation w[ould] accelerate post regulation tightening," and that New Oriental was "better positioned than others."

### K.    New Oriental Secretly Expands Into New Business Areas Not Prohibited by the Double Reduction

114.    At the same time New Oriental dismissed concerns about the severity of the Double Reduction measures that were being implemented by government regulators—but had not been

publicly disclosed—Defendants were in reality undertaking substantial efforts to divert resources and finances into other business lines that would not be impacted by the new regulations beginning no later than January 2021.  As investigative journalists in China documented after the end of the Class Period, New Oriental undertook major investments and developed initiatives in areas that were not covered by the Double Reduction ban, including by (i) investing in video, imaging and other technology companies, (ii) focusing on adult and vocational training, (iii) changing the business scope of its subsidiaries to include instruction permitted under the Double Reduction regulations in language, art, sports, science and technology training, family education consulting, and off-campus hosting, as follows:

115.    Investing in video, imaging and other technology companies.  Beginning in February 2021, New Oriental began to make significant investments in the technology, media, and telecom sector including by investing in an artificial intelligence company Shadow Science and Technology.  In April 2021, New Oriental led a fundraising round for Laihua, a creative design platform for presentation and animation video creation, and in July 2021, conducted another "pre-Series C" round for Laihua, which closed less than one week after the government announced the after-school tutoring ban.  And on July 29, New Oriental Industry Fund invested hundreds of millions of yuan in Baijiayun, a one-stop video technology that caters to well-known enterprises and government agencies in various fields such as automobiles, finance, medical care, and pan-education—an investment of such a substantial size that it clearly required months of advance planning.

116.    Focusing on adult training.  Knowing that the government was targeting K-12 students, New Oriental began making substantial investments in adult-oriented training.  Those included the effort by a New Oriental investment fund, Xingzhi Capital, to raise $100 million for

Erwan Technology, which offers services in the wealth management field, in January 2021; New Oriental's proposed take-private acquisition of Tarena International, Inc., a private education provider with the largest adult-aged (and exempt from Double Reduction) customer base of any similar tutoring provider in April 2021; the New Oriental investment fund-led financing round that raised 100 million yuan for Vocational Education and Training Institution Class View Education in May 2021; and New Oriental's investments in a Series B round for Ekeguan, which provides training for the financial tests for bank exams, in May 2021.

117.    Changing the business scope of its subsidiaries to include permitted instruction in language, art, sports, science and technology training, family education consulting, and off-campus hosting.  Weeks before the July 2021 public announcement of the Double Reduction measures, New Oriental also began making substantial changes to its education offerings.  Those steps included a formal process in which New Oriental sent out questionnaires to parents asking for feedback on proposed tweaks to after-school services for kindergarteners and primary school students and filing formal business scope changes for New Oriental subsidiaries.  As reported in the news media after the Class Period, in the weeks before the July 2021 government crackdown, several "[n]ew companies" belonging to New Oriental "were set up one after another" across a variety of industries, including off-campus trusteeship, housekeeping, daycare for infants, and nursing, while other New Oriental schools—such as New Oriental's Tianjin Oriental Training School—formally modified their business scope to add institutions engaged in the training of categories not prohibited under Double Reduction.  Similarly, almost on the eve of the Double Reduction policy, companies established by New Oriental in the city of Suzhou collectively changed their business scope to include activities not prohibited by the Double Reduction restrictions.

118. While historically New Oriental has invested in new technologies and companies that complement its core tutoring programs, since moving into after-school tutoring in 2008, never before had New Oriental invested so heavily and undertaken such significant initiatives outside the K-12 education sphere. These endeavors and investments into business lines outside of K-12 tutoring—which signify a coordinated effort to transform New Oriental's business in a manner and on a scale never before carried out by the Company—further bolster the inference that New Oriental knew of details concerning the Double Reduction ban before it was publicly disclosed.

**L.    New Oriental Learns of the Formal Double Reduction Measures But Publicly Denies Their Impact**

119. While Defendants understood the dire impact of the government's policy shift following the Two Sessions in March 2021, New Oriental learned of the precise contours of the Double Reduction ban even before it was formally approved by President Xi on May 21, and months before the policy was publicly disclosed in July 2021.

120. On May 7—or two-and-half months before the Double Reduction measures were publicly disclosed—senior executives from New Oriental met with Beijing's Party Secretary to discuss the Double Reduction measures. During this meeting, the Secretary of the Municipal Party Committee, Cai Qi, emphasized several concerns animating the measures, including that it was "necessary to strictly control the qualifications of teachers," to "standardize marketing behaviors such as educational advertisements, and strengthen management of fees and prepayments," and to "promote the healthy development of the industry by strengthening the standardized management of off-campus training institutions."

121. Next, on May 21, 2021, President Xi hosted the 19th meeting of the LGCDR—a powerful organization and the leading policymaking body responsible for education. At the meeting, President Xi "reviewed and passed" the "*Opinions on Further Reducing the Burden of*

*Homework and Off-Campus Tutoring for Students Undergoing Compulsory Education*"—or the so-called "Double Reduction" measures.  According to news accounts, the meeting and the approved measures addressed the need to "comprehensively regulate the management of off-campus training institutions, adhere to strict governance, and seriously investigate and deal with institutions that have problems such as substandard qualifications, chaotic management, taking advantage of opportunities to accumulate money, false propaganda, and colluding with schools for profit."  The *South China Morning Post* reported that "[a] clampdown will focus on the business qualification of after-school tutors, false advertising and overcharging for services."

122.    According to documents obtained by Lead Counsel in the course of its investigation, the Double Reductions policies—as they were approved on May 21, 2021—were leaked to school-level officials days after being approved by President Xi.  Those documents explicitly stated that for-profit after-school tutoring would be outlawed, required existing training institutions to be "uniformly registered as non-profit institutions," and otherwise tracked the language in the July 2021 versions of the Double Reduction policies that were eventually publicly disclosed.

123.    As noted above, under the policymaking process in China, President Xi's approval at the LGCDR necessarily meant that education officials on both the national and local levels of the Chinese government already had access to, and had reviewed, the Double Reduction measures that would be subsequently publicized in July 2021.  And New Oriental executives contemporaneously learned of their contents, having met with such officials to discuss the Double Reduction weeks before the approval of the impending ban was announced.  Indeed, as numerous news sources reported after the Class Period, Chinese officials "held multiple rounds of talks with

top private education firms to discuss the industry's future <u>before announcing</u> sweeping new regulations," and those "<u>meetings indicate[d] that companies were bracing for impact for weeks,</u>"

124.    Throughout this time—and even before New Oriental executives met Beijing's Party Secretary on May 7, 2021Defendant Yu had access to the draft Double Reduction measures through his role as a high-ranking party member under official State Council rules.  Specifically, the Double Reduction measures—which were subsequently issued by both the State Council and the Communist Party center—are subject to the State Council's Work Rules and other policies surrounding the drafting and circulation of state policies.  Under a 2016 notice describing the State Council's legislative work plan, the "in composing the drafts of law administrative regulations [and] rules, [State Council agencies] also should seek the opinions of relevant departments and local governments in writing, as well as the opinions of NPC and CPPCC delegates, members of the democratic parties," and other identified groups.  These identified groups would include key non-Communist Party officials chosen by the Communist Party for specific roles.  The State Council Work Rules published in 2018 further clarified that State Council policies must incorporate and "directly listen to the opinions and suggestions of democratic parties," such as the China Democratic League.  Outside of the main Communist Party leaders, members of the CPPCC and China's democratic parties were afforded the greatest privilege to access draft regulations.  Indeed, a key purpose of the CPPCC and its historical role was to "propagate[e] policies, provide explanations in case of doubt, smooth out emotions, and resolve conflict."  Because the primary function of the CPPCC was to ensure the implementation of national policy was carried out as effectively and smoothly as possible, CPPCC delegates were necessarily granted access to and intimately involved in developing that policy.  As both a senior member of the China Democratic League and a delegate to the CPPCC, Defendant Yu had access to drafts of the Double Reduction

measures as they existed prior to the approval by President Xi on May 21, as well as to the measures officially approved by President Xi on that date.

125.    In accordance with the regular policy implementation process in China, soon after President Xi's approval of the Double Reduction measures on May 21, provincial regulators started to effectuate them on a local level.  As Lead Counsel's investigation has uncovered, the Double Reduction measures approved by President Xi on May 21—including specifically the provisions outlawing for-profit after-school tutoring in China—were distributed to education officials within days, and made available to New Oriental executives, including Defendant Yu, who had access to the policy as a result of his status as a high-ranking party member.

### M.    New Oriental Insiders Sell Millions of Dollars of Their Personally Held Shares After Learning of the Double Reduction Measures

126.    Almost immediately after the Double Reduction measures were approved by President Xi, two of the highest-ranking executives at Koolearn—New Oriental's online division—sold over $20 million of their personally held shares in open market trades over the course of five consecutive trading days in highly unusual trades that were unlike any those executives had ever made before.  Beginning on May 28, 2021, and as publicly reported under HKEX regulations, these two New Oriental executives—Koolearn director and former co-CEO Sun and director and CFO Yin began, both of whom shared a close working relationship with Defendant Yu—began dumping their Koolearn shares.  Specifically, while in possession of nonpublic information concerning the Double Reduction measures, Sun and Yin sold over 78% and 70%, respectively, of their holdings over the course of five consecutive trading days, reaping proceeds of over $20 million.  In doing so, these executives were able to avoid substantial losses, as Koolearn shares declined dramatically and in tandem with New Oriental's and lost over half their value when the Double Reduction reforms were disclosed in July 2021.

127.    These sales were highly suspicious and indicative of New Oriental's knowledge of the Double Reduction measures and their unmistakable (but nonpublic) impact on New Oriental's business.  Former co-CEO Sun and CFO Yin were intimately involved with Defendant Yu in overseeing the Company's analysis of the Double Reduction reforms and preparing the Company's response, and their highly suspicious insider sales corroborate that Defendants knew their statements were materially false and misleading when made.

**N.      New Oriental Continues to Falsely Downplay the Severity of the Double Reduction Measures As Investors Begin to Learn the Truth**

128.    Following these significant insider sales, the news concerning the severity of the Double Reduction measures worsened for investors.  And despite Defendants' efforts to downplay, dismiss and cover up New Oriental's compliance failures and the impact of the Double Reduction regulations, investors were harmed through a series of corrective disclosures revealing the truth.

129.    Specifically, the truth emerged through a series of disclosures beginning on May 12, 2021, when news broke that the governmental reforms could be far further reaching than investors previously understood.  As reported in *Reuters*, sources familiar with the new regulations said they would likely ban on-campus tutoring as well as weekend tutoring, and that a large state broadcaster was told by regulators to remove television commercials previously placed by New Oriental.  In response to these disclosures, New Oriental shares declined 19.4%, from $142.80 on May 11, 2021 to close at $115.10 per share on May 13, 2021.  However, news reports suggested the regulations would only include limiting partial restrictions, such as by prohibiting weekend tutoring and limiting fees companies could charge.  Indeed, at the time, analysts from Credit Suisse noted that it was "unlikely and not feasible for regulators to ban tutoring completely."

130.    Then, on May 21, news reports disclosed that President Xi had "reviewed and passed" the opinions that would ultimately be publicized as the "Double Reduction" measures.  At

the time, news reports stated the reforms represented a "clampdown" on the "qualification of after-school tutors, false advertising and overcharging for services," but did not suggest an outright ban on for-profit tutoring, and final details were not released. In response to this disclosure, New Oriental shares fell 22.8%, declining from $117.50 on May 20, 2021 to a close of $90.70 per share on May 24, 2021.

131.    Next, on June 1, 2021, the State Administration for Market Regulation held a press conference where it announced that New Oriental had committed numerous violations, and issued the "top" penalty of CNY 2.5 million for "illegal acts of false propaganda and price gouging." In doing so, the regulator identified that nearly 74% of Famous Teachers listed on New Oriental's website had falsified credentials and that New Oriental had repeatedly engaged in misleading discount pricing in its advertisements. At the time, this was the single highest penalty ever imposed on an online education and training institution. In response to this disclosure, New Oriental shares fell nearly 9%, declining from a close of $102.30 on May 28 to a close of $93.20 per share on June 3, 3021.

132.    Then, on June 15, 2021, the Ministry of Education announced the creation of a new department to regulate extracurricular tutoring schools, aiming to reduce students' excessive academic burden, and to otherwise rein in the fast-developing but also problematic tutoring industry. The next day, June 16, 2021, *Reuters* reported that China was poised to unveil a much tougher than anticipated crackdown on the country's private tutoring industry, relying on four anonymous sources who said the measures would ban vacation tutoring and place restrictions on advertising. Two of the sources cited by *Reuters* estimated the reported "trial vacation ban, which adds to plans to bar online and offline tutoring on weekends during term time, could deprive tutoring companies of as much as 70-80% of their annual revenue." Another source warned that

the "new rules would be stricter than expected" and that the "industry should be preparing for the worst."

133.    Even in light of these increasingly distressing reports, New Oriental continued to mislead investors. For example, on June 18, 2021, New Oriental published a blog post that purported to refute rumors circulating on WeChat of an internal company discussion that there would be no classes on weekends and holidays beginning in 2022—a public statement New Oriental specifically issued in order to stem a stock price decline triggered by news about the loss of weekend and holiday classes. Indeed, Defendant Yu falsely denied the reports himself, stating "New Oriental has never held such a meeting, and we do not know any news. Life is not easy, why stab in the back." New Oriental's false statement had its intended effect, and helped stem the stock price decline that day.

134.    Similarly, at the China BEST Conference on June 24, 2021, New Oriental senior management told Morgan Stanley analysts that the Company had "not taken any steps yet" in response to the Double Reduction measures—even though, as set forth above, New Oriental had taken extraordinary steps in light of the impending regulations—and that "management believe[d] even under a worst-case scenario there should still be room for adjustment."

**O.    Chinese Regulators Disclose the Double Reductions Measures, Triggering Massive Declines in the Price of New Oriental Shares**

135.    Last, on Friday, July 23, 2021, unverified copies of the Double Reduction measures were circulated online and reported on by major new outlets, revealing the most severe regulations on the after-school tutoring industry ever imposed—including a ban on New Oriental's core business by requiring all tutoring institutions to register as nonprofit organizations. That day, New Oriental issued a press release noting "that certain English and Chinese language media outlets reported that the PRC regulators are considering a new set of regulations concerning after-school

tutoring service related to school subjects taught in China's compulsory education system." New Oriental continued by stating that the "regulations have not been published, and the Company has not received official notification of the regulations" and that it was "the Company's policy not to comment on market speculations."

136.    As news of the impending ban on for-profit education and New Oriental's misleading denial were absorbed by the market, the Company's share price collapsed. In response to this news, New Oriental shares lost over half their value, declining approximately 54.22%, from $64.00 per share on July 22, 2021 to close at $29.30 per share on July 23, 2021.

137.    That Saturday, July 24, 2021, China's official state media, including Xinhua News Agency and China Central Television, confirmed the Double Reduction measures and published the "*Opinions on Further Alleviating the Burden of Homework and After-School Tutoring for Students in Compulsory Education*" issued by the General Office of the CPC Central Committee and the General Office of the State Council. The Chinese Ministry of Education also released a statement explaining that it implemented the new regulations because the "after-school tutoring industry has been severely hijacked by capital," harming the "normal education ecosystem."

138.    Contrary to its earlier assurances that further regulation by the Chinese government would benefit New Oriental, the Company issued a press release on July 25 that conceded the new regulations would essentially shut down New Oriental's core business and the after-school tutoring industry. Specifically, New Oriental disclosed that, under the Double Reduction measures:

> (i) institutions providing after-school tutoring services on academic subjects in China's compulsory education system, or Academic AST Institutions, need to be registered as non-profit, no approval will be granted to new Academic AST Institutions, and an approval mechanism will be adopted for online Academic AST Institutions; (ii) foreign ownership in Academic AST Institutions is prohibited, including through contractual arrangements, and companies with existing foreign ownership need to rectify the situation; (iii) listed companies are prohibited from raising capital to invest in businesses that teach academic subjects in compulsory

education; (iv) Academic AST Institutions are prohibited from providing tutoring services on academic subjects in compulsory education during public holidays, weekends and school breaks; and (v) Academic AST Institutions must follow the fee standards to be established by relevant authorities.

139.    New Oriental's July 25, 2021 press release represented that the Company would "follow the spirit of the Opinion and comply with relevant rules and regulations when providing educational services." In other words, New Oriental finally publicly admitted what had it had known for months—that these measures would "have material adverse impact" on New Oriental's core business. In response to this news, New Oriental shares declined another 33.79%, falling from $29.30 per share on July 23, 2021 to close at $19.40 per share on July 26, 2021.

140.    Analysts, shocked by the impact of the new regulations and resulting fallout, immediately revised their outlooks on New Oriental's projections. For example, Jefferies cut its 2022 and 2023 full-year revenue estimates by 66% and 84%, respectively; CCB International reported the new regulations presented "a worst-case scenario whereby existing listed-AST operators will be compelled to spin-off their K9 AST operations from the listco, or else de-list by way of privatization." Nomura took additional steps and stopped covering New Oriental, and disclaimed its previous "investment ratings, target prices and earnings forecasts," stating that they "should no longer be relied upon."

141.    In all, as the truth concerning New Oriental's business practices and the regulations that had been adopted months before, New Oriental's shares lost over 90% of their value.

## V.    POST-CLASS PERIOD EVENTS AND ADMISSIONS

142.    Events subsequent to the end of the Class Period further confirm that during the Class Period, the Executive Defendants knew the truth about New Oriental's compliance with then-existing regulations, as well as the impending ban on after-school tutoring, and deliberately misled investors.

A.     **New Oriental Cancels Planned Filings And Avoids Answering Analysts'
        Questions for an Entire Year**

143.     After the July 25, 2021 press release in which New Oriental was forced to
acknowledge the truth regarding the ban on after-school tutoring, New Oriental went silent for an
entire week.  On August 2, 2021, New Oriental issued another press release. This time, the
Company announced that "in light of the recent regulatory developments, it [would] cancel the
board meeting" scheduled for that same day and the earnings call scheduled for the following day.

144.     Rather than face investors directly, New Oriental chose to avoid their questions.[6]
Indeed, New Oriental would not hold an earnings call until April 26, 2022—more than nine months
after the Chinese government announced regulations shutting down after-school tutoring and one
year after its last earnings call.

145.     Approximately two weeks after canceling its board meeting, on August 19, 2021,
New Oriental filed a report on Form 6-K stating that "compliance with these measures will have a
material adverse impact on its existing Academic AST business, results of operations and financial
condition."  New Oriental also informed the market that it had "stopped offering Academic AST
classes over weekends, national holidays and the current school break period in Beijing"—the
portion of its tutoring programs that had historically "accounted for the majority of the Company's
revenues from its Academic AST business."

146.     During a livestream broadcast on social video platform Douyin on November 7,
2021, Defendant Yu revealed that New Oriental would establish a large-scale agricultural platform
and online marketplace for agriculture products to help farmers in rural China sell local specialties
via live broadcasting—becoming the first for-profit educator to "pivot" its business into e-

---

[6] Foreign private issuers, such as New Oriental, are exempt from Exchange Act requirements
related to quarterly reports and certifications.

commerce, and demonstrating a rapid transition that reflected the Executive Defendants' advanced planning and knowledge during the Class Period.

147.    On November 14, 2021, New Oriental issued a press release promising compliance with the Double Reduction regulations, and announcing its "plans to cease offering tutoring services related to academic subjects to students from kindergarten through grade nine [] at all learning centers across China by the end of 2021." The Company further reaffirmed that the regulations and elimination of a substantial amount of its revenue-generating activity would "have a substantial adverse impact on the Company's revenues for the fiscal year ending May 31, 2022 and subsequent periods." As revenue "from offering K-9 Academic AST Services accounted for approximately 50% to 60% of the Company's total revenues for each fiscal year," the new regulations would have significant impact.

### B.    Defendant Yu Reveals Additional Mass Layoffs, Previously Denied by the Company

148.    On January 8, 2022, various media sources reported that Defendant Yu made a post on his public WeChat account revealing that New Oriental fired 60,000 employees in the wake of the government crackdown. According to one report, Defendant Yu's post claimed that New Oriental had "issued a statement to cover it up." Defendant Yu's post further revealed that in 2021, New Oriental suffered an 80% revenue drop and spent nearly 20 billion yuan ($3.1 billion) refunding prepaid tuition to customers, compensating employees that were laid off, and surrendering leases for learning sites across the country.

149.    After Defendant Yu's WeChat post went "viral"—and began impacting New Oriental's stock price—the Company sought to mitigate the impact of its founder's claims. In a filing on the HKEX, New Oriental acknowledged "that there has been various media coverage about the Company recently, including coverage quoting a personal blog post published by Mr.

Michael Minhong Yu on 'Laoyu Ramblings' from January 8, 2022, in relation to, among other things, the business and financial performance of the Company."  In another striking example of New Oriental's disclosure failures, in that filing, which was signed by Defendant Yu, New Oriental incongruously and incredibly claimed that Defendant Yu's public statements were "not authorized by the Company and do not represent the views of the Company."

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

150.    Numerous facts including those detailed above, considered collectively, demonstrate that Defendants knew they were misrepresenting the true facts concerning New Oriental's compliance with the 2018 Regulations and the Double Reduction ban on for-profit education companies or, at minimum, acted recklessly.

151.    <u>First</u>, Defendants had access to and obtained nonpublic information about the government's adoption of the Double Reduction measures through meetings, documents, and interactions with Chinese government officials that informed them about the dramatic shift in after-school tutoring policy by no later than January 2021.  To start, no later than May 21, 2021, Defendant Yu had access to the Double Reduction opinion as it had been approved by President Xi and before it was made public, knew by that date that the for-profit after-school tutoring industry in China was being shut down, and that New Oriental had lost the business responsible for 70% of its revenues.  As a high-ranking party member and CPPCC delegate, Defendant Yu had access to the draft Double Reduction measures even prior to May 7, 2021 and knew about the ban on for-profit tutoring as soon as it was approved by President Xi.  Armed with the knowledge of the founder and chairman of New Oriental and Koolearn, New Oriental's statements falsely claiming that New Oriental "had not taken any steps yet" in response to the Double Reduction measures and that "even under a worst-case scenario there should still be room for adjustment" were knowingly false and misleading, because Defendants knew the opposite was true.

152.    But long before Defendant Yu reviewed the approved text of the nonpublic Double Reduction policy, Defendants knew that increasing government scrutiny posed existential threats to New Oriental's business.  Uncommonly strong public warnings from top government officials, including the CCDI's warning of the improper influx of a "whirlpool of capital" in January 2021, Minister of Education Chen Baosheng's speech calling for "stricter supervision" of after-school tutoring to "free students from endless after-school classes and curriculums" in February 2021, and President Xi's damning critique of the industry as a "stubborn disease" and "chaotic" in March 2021, made clear to Defendants—particularly Defendant Yu, with his experience as a member of a Chinese political party and senior leader of CANGE—the government's policy shift.

153.    Defendant Yu's knowledge of the government's actions was informed by his participation as a delegate at the Two Sessions meetings where President Xi proclaimed his intention to fundamentally alter the industry, and is evidenced by Defendant Yu's own conduct. In stark contrast from his active and public role as a for-profit education advocate at prior Two Sessions meetings, Defendant Yu remained silent in the face of President Xi's attack and declined to defend the industry—demonstrating that he knew the policy shift had already occurred, and he was unable to do anything about it.

154.    Defendants' scienter and nonpublic knowledge about the Double Reduction was also obtained through meetings with senior government officials—including with the Ministry of Education in March 2021, during which New Oriental representatives agreed to "fully cooperate" with the government's new rules; with Beijing's Party Secretary on May 7, 2021, during which Company leaders discussed the Double Reduction measures over two months before they became public; and through New Oriental delegates' attendance at the 19th Meeting for the LGCDR on May 21, 2021, during which President Xi "review and approved" the Double Reduction opinions.

And as confirmed by Lead Counsel's investigation, a leaked version of the Double Reduction policies was made available to and reviewed by New Oriental officials in May 2021—a document that explicitly stated that the Double Reduction regulations would ban for-profit tutoring and requiring existing training institutions to be registered as non-profit institutions. As a high-ranking member of the China Democratic League, Defendant Yu had access to the Double Reduction policy as it was approved and reviewed on May 21, and in his role as the CEO of the largest for-profit after-school tutoring agency in China, unquestionably reviewed it and discussed its contents with the other Executive Defendants.

155. Defendants' scienter is independently confirmed by investigative journalists' reports published after the end of the Class Period. For example, as *Caixin Global* reported, "Chinese officials held multiple rounds of talks with top private education firms to discuss the industry's future before announcing sweeping new regulations last week that are set to transform the sector," and "senior executives were aware of the looming policy change since at least the start of July." In fact, from at least January 2021 through July 2021, New Oriental repeatedly met with senior officials in the Chinese government and in those discussions learned the details of the Double Reduction ban long before it was disclosed.

156. Second, the alleged fraud concerns the single-most important part of New Oriental's business, and the government regulations and compliance violations concealed from investors were topics that the Executive Defendants themselves told investors they knew about in intimate detail and discussed on every conference call during the Class Period. After-school tutoring is, by far, the most important part of New Oriental's business, and Defendants discussed it extensively as New Oriental's "key business unit," "key revenue driver," and "key growth driver" on every investor call and repeatedly emphasized its vital importance during the Class

Period. After-school tutoring accounted for 60% of the Company's revenues, totaling billions of dollars each year, and was the most critical driver of the Company's future growth.

157.   In light of its importance, the Company's compliance with the regulations governing after-school tutoring, as well as the New Oriental executives' insight into regulatory developments, was a subject of intense market scrutiny and concern, and a topic on which Defendants made numerous public statements during the Class Period. In fact, during the Class Period, Defendant Yang identified government regulation as the "biggest risk that management is thinking about" in its ability to meet the Company's top-line revenue targets. As noted above, the Company's enrollment growth and compliance with existing regulations were critical to the Company's value and the value of its stock, analysts were intensely focused on these issues both before and during the Class Period, repeatedly asking about these issues, and questioning Defendants about the causes of any changes in enrollment growth.

158.   Defendants, who were the Company's highest-ranking executives, made a litany of statements about these subjects in response to analyst questions, and were well aware that analysts were relying on the veracity of their statements. For instance, at the beginning of the Class Period during New Oriental's earnings call on October 23, 2018, Defendant Yang discussed the impact of Circular 80 and stated that while the new regulations would have "some incremental teacher cost," New Oriental was "in the process of the communication with the local government" in each city, and the regulation's impact on the Company's margins was "not a big deal." In another example, on New Oriental's earnings call on April 20, 2021, a month after the pivotal Two Sessions meetings and just three months before the Double Reduction was publicly disclosed, New Oriental touted its purported insight into the government's regulatory scheme, saying "the government's intention to tighten after-school tutoring business policy is not a surprise to us," that

the new regulations will "foster a positive environment for the whole market," and that the Company was "aligned with the government policy."

159.    Even before the Class Period, Defendant Yu personally addressed a scandal concerning the falsification of the qualifications of New Oriental's "Famous Teachers," publicly described the incident as "deeply shameful" to New Oriental and to him personally, and committed to ensuring this conduct was addressed and rectified.  In fact, following this incident, Defendant Yu served as the public face of the for-profit tutoring industry and led an effort to have 160 for-profit institutions—including New Oriental—commit in writing to ensuring compliance.  In other words, the Executive Defendants were intimately familiar with the Company's noncompliance with the regulations they professed to monitor (or were reckless touting their oversight and commitment to compliance), and knew about the government's policy shift at the time they made their misstatements, which strongly supports an inference of scienter.

160.    Third, Defendants closely tracked New Oriental's compliance violations and directed and approved the marketing and other efforts to grow student enrolments, and thus knew or recklessly disregarded the true drivers of New Oriental's revenue throughout the Class Period. As described above, many of the regulatory fines leveled at New Oriental were the maximum possible penalty available under applicable law, the violations were not isolated but occurred at many different locations and at different centers in different regions in China, and could only have been carried out with the approval of senior management.  Defendants' knowledge of New Oriental's compliance violations is also evidenced by the fact that, as New Oriental highlighted in its SEC filings and other statements to investors, the Company's brand reputation was the key to its success.  For this reason, any regulatory violations posed a serious threat to New Oriental's business given the highly competitive environment for after-school tutoring in China.  As a result,

and in light of their intense focus on brand management, during the Class Period, Defendants were keenly aware of the Company's noncompliance at the time of their misstatements.

161.    <u>Fourth</u>, Defendants' knowledge of the Double Reduction ban before its public announcement is evidenced by New Oriental's extensive preparation for the impending ban through its investments in business lines and initiatives other than those impacted by the government ban, formally applying for changes in its subsidiaries' scope of business, and undertaking efforts to lay off 20% of its workforce immediately after President Xi's comments at the March 2021 Two Sessions.  From January 2021, when the Chinese officials issued substantial warnings to for-profit tutoring providers, until July 2021, when the details of the ban were made public, New Oriental invested tens of millions of dollars in companies that would not be impacted by the ban and engaged in new business development efforts on a scale and speed unlike at any prior time at the Company.  And when directly asked about the layoffs by reporters in April 2021, New Oriental falsely denied the reports as incorrect rumors, claiming they were merely ordinary-course "quarterly optimization" measures.  In reality, New Oriental's extraordinary measures to shift away from for-profit tutoring to other businesses during the Class Period could only have been undertaken at the direction of the Company's senior management.  Indeed, as directors, Defendants Yu and Zhou were specifically charged with reviewing and approving the "acquisition or disposition of any businesses or asset(s) material to the Company or <u>the entry of the Company into any major new line of business</u>."  The Executive Defendants' knowledge and direction of the Company's substantial pivot toward businesses not prohibited by the Double Reduction measures confirm they knew about for-profit tutoring ban long before it was publicly disclosed.

162.    <u>Fifth</u>, at the time of their misstatements, government regulators were taking numerous active steps that were not apparent to investors—such as pulling television

advertisements purchased by New Oriental—that demonstrated to Defendants that the Double Reduction bans were incredibly severe and different from prior measures. The removal of TV commercials New Oriental had paid for further informed the Company that it had run afoul of regulators—but rather than disclose the truth, New Oriental came up with false excuses about its advertising plans in an effort to downplay the significance of the government's actions.

163.    Sixth, New Oriental senior executives were motivated to hide the Company's noncompliance with the 2018 Regulations and the pending implementation of the Double Reduction measures to benefit from sales of their personally held shares at artificially inflated prices. New Oriental executives Sun and Yin sold 78% and 70% of their personally held Koolearn shares over the course of five trading days at the end of May for proceeds of over $20 million— just one week after President Yi officially approved the Double Reduction policy and before the policy was publicly released. These trades, in which New Oriental executives sold an overwhelming portion of their overall holdings in such a short time, are highly probative of fraudulent intent. Indeed, these two insiders sold a total of $32 million of their personally held shares at artificially inflated prices during the Class Period, or 99% and 70%, respectively, of their entire holdings. Given their senior-level positions at Koolearn and close working relationship with founder Minhong Yu, their highly suspicious trades provide additional support for the inference that other high-level New Oriental seniors executives also knew the truth about the Double Reduction regulations before they were publicly disclosed, and provide strong support for New Oriental's scienter.

164.    Notably, because New Oriental is a foreign private issuer, it is exempt from Form 4 disclosure requirements under Section 16 of the Exchange Act. Specifically, whereas sales of Koolearn shares were required to be reported under HKEX rules, sales of New Oriental ADSs

were exempt from reporting requirements under Section 16. As a result, pre-discovery, Lead Plaintiff has no practical ability to identify sales of registered New Oriental shares by the Executive Defendants during the Class Period, as the Executive Defendants were not required to report any sales of registered shares with the SEC. Nor were the Executive Defendants required to report sales of New Oriental shares under HKEX rules, as such rules did not apply to New Oriental as an exempt issuer under Chapter 19C of the Rules Governing the Listing of Securities on The Stock Exchange of Hong Kong Limited, including the insider transaction reporting requirements under Rule 19C.11. Further, although New Oriental insiders were required to file Form 144s in connection with the sale of any unregistered New Oriental securities, no Form 144s have been filed by any New Oriental insider over the past two years.

165. The securities law exemptions enabling New Oriental's senior management—the Executive Defendants—to avoid publicly disclosing their insider trades has been described by securities law experts as highly problematic, as such rules "effectively shield the trades of foreign insiders from public scrutiny and market discipline," and are particularly concerning in the case of Chinese issuers like New Oriental. As those academics have quantified by reviewing available Form 144 filings over a four-and-a-half year period, Chinese insiders place opportunistic trades that—on average—enable insiders to avoid between \$3.829 and \$3.950 million in losses, an outcome described as a "shocking amount of loss avoidance" suggesting a "strong possibility of rampant illicit activity."[7]

---

[7] *See* Taylor, D. et al., *Holding Foreign Insiders Accountable*, NYU Law and Economics Research Paper No. 22-16, at 1, 6 (July 21, 2022) (studying available Form 144 data for Chinese and Russian-based issuers from January 2016 through July 2021 and concluding the identified "shocking amount of loss avoidance suggests the strong possibility of rampant illicit activity").

166.    If anything, the failure to report any sales by any New Oriental insider over the past two years is probative of scienter for several reasons.  First, the fact that there has not been a single Form 144 filing by any New Oriental insider for over two years is highly unusual for any issuer. Second, the fact that no insider sales have been reported appears highly unusual in light of the fact that New Oriental has disclosed it has provided millions in share-based compensation to its senior executives every year for the past decade, with stock grants that expire within one to three years, and with New Oriental reporting only minimal shares as being forfeited (i.e., unexercised) over this time period. Because it is highly unlikely that New Oriental executives would have let millions of dollars in shares go unexercised every year, the far stronger inference is that the Executive Defendants sold a substantial number of registered shares that were not required to have been reported to the SEC or investors.  Indeed, the Executives Defendants' Koolearn counterparts sold nearly all of their shares in five days before the Double Reduction policy was publicly disclosed, and it is highly unlikely that the Executive Defendants would not have likewise sold any shares during the Class Period.

## VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

167.    Throughout the Class Period, Defendants made a series of materially false and misleading statements and omissions, including those concerning: (1) New Oriental's compliance with government regulations; (2) the reasons and factors driving the Company's financial performance, including the benefits the Company would experience through increased regulations, regulatory oversight, and increased industry consolidation, as well as other drivers of its reported revenues; and (3) the Double Reduction measures and the ban on after-school tutoring that was publicly disclosed in July 2021.

A.      **Materially False and Misleading Statements and Omissions Concerning New Oriental's Business Conduct and Compliance with Regulations**

168.    Throughout the Class Period, Defendants misled investors concerning the Company's compliance with government regulations in China.  For example, in response analysts' questions about its compliance to government regulations, the Company claimed in July 2019 that it "continue[d] to comply with the regulatory requirements closely and cooperatively."  In addition, in its very first Annual ESG Report, filed on April 26, 2021, New Oriental claimed that it "strictly abide[d] by relevant laws and regulations."  In that report, Defendants also falsely claimed to comply with specific rules and regulations imposed by the Chinese government on its after-school tutoring services, including compliance with advertising, teacher qualification and curriculum restriction regulations.  These statements were materially false and misleading.  For example, the Annual ESG Report stated:

(a)     Page 4:  "We strictly abide by relevant laws and regulations in our teaching work."

(b)     Page 30:  "The Group strictly abides by the Advertising Law of the People's Republic of China, Law of the People's Republic of China on the Protection of the Rights and Interests of Consumers, Law on the Promotion of Non-public Schools of the People's Republic of China and other laws and regulations, and has established a strict review process to ensure the authenticity and effectiveness of the information released and conform to the scope and content of New Oriental's services, creating a healthy, orderly and safe cyberspace and learning environment for students and parents.

When recruiting students, we are responsible for the truthfulness of the content of advertisements published on websites, posters, internal journals and magazines, brochures, flyers, enrollment brochures and other promotional materials of each institution, especially for the accuracy of the content of courses, teachers' backgrounds, services provided, classroom environment and accommodation conditions, preferential measures and other promotional wording, so as not to present vague concepts, vulgar language and misleading content, and to present true, clear, effective and accurate information for students."

(c)     Page 11:  "The [Code of Conduct] provides that every employee must abide by local laws and regulations."

67

      (d)    Page 9:  "The Group <u>strictly abides</u> by the Company Law of the People's Republic of China, the securities market rules and supervision requirements of both the U.S. and Hong Kong, and it has built up a scientific and efficient corporate governance mechanism featuring well-defined power and responsibility and coordinated operations."

169.    Contrary to these representations, in reality, New Oriental did not "strictly abide" by the key regulations governing after-school tutoring imposed by the Chinese government. Instead, the Company repeatedly flouted the regulations that governed the after-school tutoring industry to such an extent that President Xi and top policymakers described New Oriental's and other market leaders' conduct as a "stubborn disease" and "chaotic."  As set forth above in ¶¶83-94, rather than "strictly abide" by the 2018 Regulations or the Advertising Law, New Oriental falsified the teacher qualifications of over 70% of the "Famous Teachers" it featured on its website, engaged in price gouging and deceptive advertising, and otherwise failed to comply with key aspects of these laws.  This noncompliance not only posed substantial risks to New Oriental's reputation and brand but in fact resulted in millions of dollars in fines and penalties and severe regulatory action.

**1.    Materially False and Misleading Statements Concerning Compliance with Teacher Qualification Requirements**

170.    New Oriental represented that it complied with regulations concerning teacher qualifications.  For example, on October 23, 2018, the first day of the Class Period, New Oriental hosted its earnings call for the first quarter of its fiscal year 2019.[8]  Defendant Yang assured investors that teachers would possess the necessary qualifications under the regulations and that any teachers who could not get the requisite certifications would be moved to other roles or replaced, saying:

---

[8] New Oriental reports its results on a fiscal year ending on May 31.

68

Question – Andrew J. Orchard [Analyst]: Hi, evening. Thanks for taking my question. <u>Can you give us more color on the specific regulation that is most impacting your cost</u>? I know you talked about rental, for example, so is it things like having to allocate more space, is that part of the pinpoint or is there anything else that is really meaningful that we should be noticing? And the other question is on the long-term margin guidance. I think you had mentioned before that 17% to 18% in two to three years' time. Are you still standing by that long-term guidance? Thanks.

Answer – Zhihui Stephen Yang: I don't want to change my long-term margin guidance. It's just we postponed one year, okay? So we don't want to – <u>because this year that we have to meet the requirement of the new regulations and in some online investments</u>. So I don't want to change my guidance of the long-term margin.

***

So in the coming new task, almost all our teachers with our license will attend test and we believe the pass rate will be very high, okay? But, I can't say 100% of our teachers will get a license. So if, I said <u>if some teachers cannot get a license, we will move them from the teacher position to the teaching assistant position or we'll change some teachers</u>. That might be some incremental cost, okay. But we do believe we have the high level of the whole industry to meet the government requirements, okay?

171.    Defendants made additional statements to analysts on other quarterly earnings calls concerning teacher qualifications, and assuring them that teachers would hold "qualifications as required."  On the January 22, 2019 earnings call for the second quarter of fiscal year 2019, for example, Defendant Yang said New Oriental was "seeing the – the high passing rates for the last exam. <u>And we're fully committed to our efforts to ensure all the teachers hold their qualifications as required</u>."  Defendants made similar false and misleading statements throughout the Class Period, including during the earnings calls for the third and fourth quarters of 2020, as well as the first and second quarters of 2021.

172.    On November 3, 2020, New Oriental filed the Prospectus Supplement to its Registration Statement and effectuated its Secondary Offering.  In the Prospectus Supplement, New Oriental stated that "[a]t the core of our education ecosystem are our high quality teachers and systematic teacher selection, training and retention processes."  Further, New Oriental stated

69

that its "value proposition" provided students with "[a]ccess to high quality teachers," and it characterized one of the Company's strengths as its "[s]ystematic approach to hiring and training high quality teachers."

173.    New Oriental also expressly and falsely denied that it violated regulations governing its teachers' qualifications in response to direct inquiries from the news media. For example, as set forth in a May 18, 2020 report, in response to an investigation by journalists at China News who uncovered that a Koolearn teacher identified as "Secondary English Summer School" instructor lacked an appropriate qualification number as required by the 2018 Regulations, New Oriental falsely dismissed the error as resulting from an inadvertent failure to update Koolearn's website, suggesting that the "background has not been uploaded," and later claiming the "teacher qualification" number that was posted referred to a Certificate in Teaching English to Speakers of Other Language, or CELTA, certificate number. On April 23, 2021, Beijing Youth Daily reported that "[t]here are problems with many teachers' qualification certificates under New Oriental," including the widespread falsification of teacher qualifications described in ¶¶86-91 above. After the news media asked questions about these misstatements, New Oriental removed these profiles from its website and falsely claimed that "there was no fraud in the qualifications of teachers, and all teachers at the corresponding stage taught the corresponding courses."

174.    The statements set forth above in ¶¶170-73 were materially false and misleading and omitted material facts because, as described above, New Oriental falsified teacher qualifications throughout the Class Period. These statements created the false impression that New Oriental followed pertinent teacher qualification requirements. Despite the fact that New Oriental repeatedly touted the quality and qualifications of its teachers to investors, New Oriental

misrepresented this key differentiator in the after-school tutoring industry. In reality, New Oriental routinely misrepresented its teachers' qualifications.

### 2. Materially False and Misleading Statements Concerning Compliance with Curriculum Content Regulations

175.    Throughout the Class Period, New Oriental assured investors that it complied with curriculum requirements established by the government. For example, in its Form 20-F for Fiscal Year 2018 ("2018 Annual Report"), New Oriental stated that it "work[ed] closely with the local educational authorities to make sure that our curriculum is compatible with public school curriculums and covers the full spectrum of required courses." New Oriental made similar statements in its Forms 20-F for Fiscal Years 2019 and 2020 (the "2019 Annual Report" and "2020 Annual Report," respectively, and together with the 2018 Annual Report, the "Annual Reports," all of which were signed by Defendants Yang and Zhou).

176.    On October 23, 2020, New Oriental filed a Form 6-K with the SEC signed by Defendant Yang. In this Form 6-K, New Oriental stated that "Since the promulgation of the State Council Circular 80, our training schools have passed the annual inspections conducted by the education authorities and we have never been penalized for reason of tutoring content violating the State Council Circular 80 or the Tutoring Negative List."

177.    On May 10, 2021, during an interview with *Southern People Weekly*, Defendant Yu assured investors that "New Oriental never engage[d] in advanced teaching" and it is "very clear" that "the state has strict regulations on this aspect, and we don't have to make our own regulations."

> P:  In the structure of New Oriental today, English training only accounts for about half of the income, and in Youneng Middle School, the whole subject training of language, mathematics, English, physics and chemistry accounts for the other half. Do you also have some contradictory attitudes to look at this round of education and training governance?

Y:  There is no contradiction. <u>We New Oriental never engage in advanced teaching</u>. 90% of the students guided by New Oriental are students who make up for shortfalls.  Students can't keep up with school.  They have no choice but to come to New Oriental. The teachers help them improve their grades and make them feel right. Confidence in learning.

I don't mean to let a group of students come to the fifth grade in the third grade, and the fifth grade to study in the first year of junior high. New Oriental never does such a thing.

P: Do you have clear rules? This is not allowed.

Y: <u>Yes, it is very clear. Now the state has strict regulations on this aspect, and we don't have to make our own regulations</u>. From the very beginning, I would not allow New Oriental to do advanced education.  I've always told parents that if your child can study on his own, don't enroll your child in any class. It's much better for your child to exercise their self-learning ability than listening to a teacher's lecture.

178.    The statements set forth above in ¶¶175-73 were materially false and misleading and omitted material facts because, as described above, New Oriental violated Chinese government regulations concerning appropriate curriculum content throughout the Class Period. Despite regulations requiring that students be taught the grade-appropriate curriculum, and contrary to Defendant Yu's representation that New Oriental "never engaged in advanced teaching," the opposite was true.  As set forth in ¶94, New Oriental taught material more advanced than that which was approved by the government, and did so specifically in order to attract customers and grow enrollment, exposing the Company to government sanctions.

### 3.    Materially False and Misleading Statements Concerning False Advertising Placed by New Oriental

179.    New Oriental also misled investors concerning its compliance with relevant advertising laws.  As noted above, New Oriental claimed compliance with pertinent advertising laws, including in its ESG Report.  Despite acknowledging that the Company was "responsible for the truthfulness of the content of advertisements" and "strictly abide[d]" regulations requiring those advertisements be "true, clear, effective and accurate," New Oriental's advertisements

materially mispresented the costs and value of its services, including by misrepresenting the prices and discounts offered and the content and quality of its programs. Defendants' statements were materially false and misleading because, in reality, New Oriental did not comply with requisite advertising laws and was repeatedly fined for "deceptive advertising practices" as described above in ¶¶84-93. In fact, while New Oriental represented that it had "never been penalized for reason of tutoring content," in reality, New Oriental repeatedly violated this prohibition.

**B.    Materially False and Misleading Statements and Omissions Concerning New Oriental's Revenue Drivers and the Benefits of Increased Government Scrutiny into For-Profit After-school Tutoring**

180.    Throughout the Class Period, Defendants also misled investors concerning the reasons for the Company's financial performance while falsely claiming that the Company was poised to benefit from industry consolidation. Specifically, New Oriental attributed the success of its after-school tutoring business to legitimate business factors while failing to disclose that the Company's after-school tutoring revenues resulted from the illicit business practices detailed above.

181.    For example, on October 23, 2018, the first day of the Class Period, New Oriental released its financial results for the first quarter of fiscal year 2019, reporting that net revenues increased by 30.1% year-over-year to US $859.8 million and that enrollments in academic subjects tutoring and test preparation courses increased by 13.2% year-over-year to approximately 1,735,300 students. In the release, Defendant Yu stated that New Oriental's K-12 after-school tutoring business was its "key growth driver" and had "continued its strong growth and achieved approximately 49% increase in revenue."

182.    During an investor call that same day, Defendant Yang attributed the 49% growth in after-school tutoring revenue to the Company's "solid performance in student enrollment in the recent two quarters." Defendant Yang characterized the recently issued regulations as a positive

development for the Company and assured investors of the Company's compliance, presenting the

2018 Regulations as a "great opportunity" for New Oriental to take market share from "smaller

players" that did not comply with the regulations.  Specifically, Defendant Yang represented:

> [A]s the Chinese government continues to enhance regulatory oversight, we expect China's after-school tutoring market to further consolidate. We believe that regulatory efforts will bolster a positive environment with improved market standards and enhanced teaching quality, supporting the healthy growth of the market in the long term. As a leading education service provider in China, our company is fully supportive of these reforms and we're committed to providing high-quality education service and doing our share to build out a sustainable and robust market.  <u>At this stage, we do not foresee any material impact of the regulatory reform on our top line growth</u>, while our administrative costs and expenses may increase in the short term.
>
> * * *
>
> We're confident that New Oriental will continue to capture sustainable growth opportunities in the market and deliver long-term value for our shareholders.

183.    In response to an analyst's question about "the competitive landscape given the

regulation [] changes," Defendant Yang stated that the Company had already seen the benefits of

the more stringent regulations, with students migrating from "small players" that were not

compliant to New Oriental:

> The government continues to have the regulatory oversight. And as a leading education provider, absolutely we fully support the government reforms. <u>And I think it's a great opportunity for big players like us. I think we will keep doing to provide the better service in the home market.  So I think this is an opportunity for us to take more market share from the small players. Maybe you would have read some news historically, some small players, they can do the business in the proper way, and we have seen some students in the last six months, the students from the small players originally to join our classes.  So this is what we have seen in the last six months. And I think it's just a great opportunity for us.</u>

184.    The statements above in ¶¶181-83 that New Oriental did "not foresee any material

impact of the regulatory reform on our top line growth" from the new regulations, describing the

increased government scrutiny and new regulations as a "great benefit," and representing that New

Oriental's results had already been positively impacted by the new regulations with "students from

the small players originally to join our classes" in the past six months, were materially misleading. Specifically, these statements were materially misleading because they omitted the highly material facts, as set forth in ¶¶84-93, that New Oriental engaged in the same prohibited misleading advertising and other practices as were other "small players" and that, as a result, increased regulations and government scrutiny were not a "great benefit" but in fact posed substantial risks to the Company. Defendants' statements that the Company's results had benefitted from students from "small players" switching providers and enrolling in New Oriental programs were materially misleading because they omitted the highly material facts that New Oriental engaged in "illegal acts of false propaganda and price gouging" in the promotion of its tutoring programs, that these practices secretly and positively boosted New Oriental's reported enrollment and revenue figures, and that these practices invited the same government sanctions that impacted "small players," as described above at ¶¶84-93.

185. On January 22, 2019, New Oriental released its financial results for the second quarter of fiscal year 2019. Specifically, the Company reported net revenues increased by 27.8% year-over-year to US$597.1 million and enrollments in academic subjects tutoring and test preparation courses increased by 23.6% year-over-year to approximately 2,320,800 students. In the release, Defendant Yu praised the Company's "remarkable year-over-year revenue growth of approximately 38%" for its K-12 after-school tutoring services, attributing the results to "a combination of a solid high-quality product portfolio and a sustained market demand." In the release, Defendant Zhou pointed to the Company's "well-proven Optimize the Market strategy," while Defendant Yu stated that "[w]e are pleased to see our overall business continue its strong momentum," which was "driven largely by our key business unit, K-12 all-subjects after-school tutoring."

186.     During an investor call that same day, Defendant Yang attributed the after-school tutoring business's success to the Company's "solid high quality product portfolio and sustained the market demand," as well as the impact of new regulations that had resulted in increased industry consolidation.  Specifically, Defendant Yang represented that New Oriental was "firmly supportive" of the new government regulations, which he represented would not have a material negative impact on the Company, and that the "current impact" of the new regulations was "in line" with the Company's expectations:

> The current impact so far is in line with our expectations. And as the leading education service provider in China, our company is firmly supportive of these reforms which will improve market standards and bolster healthy growth of the industry. As always, we're committed to provide high quality education services and contributing to a creation of sustainable markets. At this stage, the reforms are currently being implemented on a city-by-city basis. With our market leading position and robust business foundation, we do not expect to see material negative impact on our growth opportunities nationwide.  Although, we do expect to see incremental administrative cost and expenses as a result of the implementation of the policies in certain cities.

187.     When an analyst asked for "some general updates about the regulations" and how investors should think about the outlook, Defendant Yang reiterated New Oriental's commitment to compliance with the new regulations, particularly regarding teacher qualifications:

> In terms of the regulation update we are pleased totally – I must mention that we are fully supportive of the government's reforms and in their implementations and we're committed to doing our part in fulfilling the healthy growth in the whole sector. As newly introduced the policy in the market are currently being carried out by a city-by-city basis. As I mentioned in the prepared remarks and we continue to foresee some certain degree of the possible changes and some incremental possible changes and some incremental expenses in – in full term. This impact is so far is in line with our expectations. And going forward, we expect the impact will – will be in line with our expectations. And the three things were I want to add in to these regulation relates things. So first one is teacher's license. We are still in process of these, we push all the teachers to pass the exams of the teacher licenses plan.

> And we're seeing the – the high passing rates for the last exam. And we're fully committed to our efforts to ensure all the teachers hold their qualifications as required.

188.    In response to further questions about the impact of the regulations, and whether New Oriental would see increased enrollment given in light impacts on smaller providers, Defendant Yang contrasted New Oriental's business practices with those of smaller players, stating the Company was committed to "<u>doing our job in a proper way</u>":

> Yeah, we are seeing some small players were kicked out of the markets by the new regulations. And we have seen certain students including us because some students tell us. <u>And I think our job is to [be] doing our job in a proper way. We will provide the best quality services to the parents and the students</u>. And we're happy to see the highest student retention rates. I think this is very good, the results of the -- of our investments for the last two years to three years. <u>And I think the market demand is always there and we will do it in a proper way is always there</u>. And we will do it – or we will do it – in our – probably of ourselves, and our job is to provide the best of service to the students, and to take more market share from the market, okay? Thanks.

189.    The statements above in ¶¶185-88 that the impact of the new regulations were "in line" with New Oriental's expectations, that the Company did not expect a "material negative[]" impact," describing the new regulations as a positive because "small players were kicked out of the markets," and stating that New Oriental would benefit because it would comply with the regulations and "do it in a proper way" were materially misleading.  Specifically, these statements were materially false and misleading because rather than conduct its business in the "proper way," in truth, New Oriental engaged in prohibited advertising and other misconduct involving "illegal acts of false propaganda and price gouging" in the promotion of its tutoring programs as set forth above in ¶¶84-93.  Defendants' statements that New Oriental's results had benefited from increased government scrutiny, industry consolidation, and "well proven Optimize the Market" strategy were also materially misleading because they omitted the highly material facts that New Oriental's results had been secretly positively impacted by its deceptive advertising practices and other regulatory violations, that these practices invited the government sanctions that New Oriental

misleadingly claimed uniquely impacted "small players" that, unlike New Oriental, did not operate their businesses in the "proper way."

190.    On April 23, 2019, New Oriental released its financial results for the third quarter of fiscal year 2019, reporting net revenues increased 28.9% year-over-year to US$796.7 million and that student enrollments in academic subjects and test preparation courses increased by 82.3% year-over-year to approximately 1,570,600.   In the press release announcing these results, Defendant Yu attributed New Oriental's success to the Company's "ceaseless efforts in improving teaching quality and enhancing learning experience for our students."

191.    During an investor call that same day, Defendant Yang's prepared remarks pointed to New Oriental's "continued acceleration of growth momentum in this quarter," which was "largely driven by the exceptional performance of our key business unit, the K-12 all-subjects after-school tutoring, once again demonstrating our quality product and service offerings and strong business fundamentals which enable us to capture growing demand from the market." Defendant Yang also specifically addressed the 2018 Regulations, stating:

> With newly introduced policy related to the after-school tutoring institutions being implemented on a city-by-city basis, we continue to foresee certain degree of the uncertainty while the current impact so far is in line with our expectations. As a leading education service provider in China, we're firmly supportive of these reforms which will improve the market standards and bolster a healthy growth in the industry.
>
> As always, we're committed to provide high-quality education service and contributing towards creation of a sustainable market. We do not expect to see material negative impact on our growth opportunity nationwide, although we do expect to see incremental administrative costs and expenses as a result of the implementation of the policies in certain cities.

192.    When an analyst inquired about the "biggest risk that management is thinking about," Defendant Yang first identified government regulations and then human resources risk:

Question – Analyst:  What is the biggest risk that management is thinking about at this moment for next year potential of missing the 30% top line growth and margin expansion target? Is it going to be policy or is it going to be competition?

Answer – Defendant Yang:  I think for the management concern, we always have two kinds of the risks. The first one is regulation for both the overseas test prep and the K-12 business, and so this is the first part of the risk.  Secondly, we do have the human resource risk. Even though we spent a lot in the last three years to build up a new education system, but we still rely on the talent people to run the business especially for the local school head. So, there's a risk for the human resources. Okay? Two risks, regulation and human resources, okay?

*****

With newly introduced policy related to the after-school tutoring institutions being implemented on a city-by-city basis, we continue to foresee certain degree of the uncertainty while the current impact so far is in line with our expectations. As a leading education service provider in China, we're firmly supportive of these reforms which will improve the market standards and bolster a healthy growth in the industry.

193.    The statements above in ¶¶190-92 that New Oriental the implementation of the regulations had been "in line with our expectations," that the Company did "not expect to see material negative impact on our growth opportunity nationwide," and that New Oriental's results had been positively impacted by legitimate factors, including the Company's "ceaseless efforts in improving teaching quality and enhancing learning experience for our students," were materially misleading.  Specifically, these statements were materially misleading because they omitted the highly material facts that New Oriental engaged in "illegal acts of false propaganda and price gouging" to drive student enrollments and that New Oriental's results had been artificially boosted by these practices.  It was also materially misleading for New Oriental to state that the new regulations had been "in line with our expectations" while omitting the highly material facts that New Oriental's actual business practices violated those regulations, as set forth above at ¶¶84-93.

194.    On July 23, 2019, New Oriental released its financial results for the fourth quarter of fiscal year 2019.  In the release, Defendant Yu highlighted New Oriental's K-12 after-school

tutoring business as the Company's "key growth driver," reporting that "net revenues increased by 20.2% year-over-year to US$842.9 million" and "student enrollments in academic subjects tutoring and test preparation courses increased by 33.9% year-over-year to approximately 2,756,000." In discussing the Company's results on a conference call that day, Defendant Yang answered questions about a summer promotion program, the costs and strategy for marketing the Company's Koolearn online programs, and the impact of the 2018 Regulations. In response to analyst's question about the impact of new regulations limiting middle school admission examinations, Defendant Yang represented the regulations would benefit New Oriental by enabling the Company to take market share from competitors:

> Answer – Zhihui Stephen Yang: Yeah. And the regulations, yeah, there's some regulation since last year, but our attitude is to fully support the government reforms and implementation. Actually for the offline side, the regulation is carried out on city by city basis. But we do not foresee any material impact from the regulations.
>
> And on the contrary, we fully support of the regulations from the government because I think it's good for the whole industry. And so, we're doing our jobs to provide better service to the students and to provide better products and to give the better feedback from the parents and kids. So, this is our target. So, I think this is a good timing for us to take more market share by providing the better product. So, this is our attitude to the policy.

195.    Further, in response to an analyst's question about the Company's marketing efforts to promote New Oriental's online Koolearn programs, Defendant Yang represented that the Company would focus on content development, R&D and teachers' recruiting and training, as opposed to advertising, as follows:

> Question – Tian X. Hou: Sorry, I was silent myself. Hi Sisi and Stephen. Congratulations on a good quarter. I also have two questions. One is related to Online Education. We see the competition of the Online Education in China sort of heated up and we saw a lot of advertising, offline advertising, online advertising and so, EDU is also one of the Online Education vendors. I wonder what is the strategy for EDU to further develop your Online Education's brand awareness and as well as revenue market share. That's number one.

***

Answer – Zhihui Stephen Yang: Okay. Thanks, Tian. Your first question relate to the Online Education. With the goal of tapping into the market opportunities in the pure Online sector, I think we continued to invest. But we would rather spend more money on the content development, R&D and teachers' recruiting and training. And also, we will spend some money on the targeting, selling/marketing expenses. <u>But I think the spend on the marketing will be reasonable because we won't use the burning money way to acquire students as we did in our offline business historically</u>. So this is our online strategy….

196.    The statements above in ¶¶194-95 that suggesting new regulations concerning middle school admissions benefitted New Oriental by enabling the Company to "take more market share by providing the better product" was materially misleading.  Specifically, this statement was materially misleading because it omitted the highly material facts that New Oriental engaged in practices that violated regulatory requirements and that New Oriental's violations posed extreme risks to the Company, as set forth above at ¶¶84-93.

### 1.    Materially False and Misleading Statements Concerning New Oriental's Revenue Drivers during Fiscal Year 2020

197.    On October 22, 2019, New Oriental released its financial results for the first quarter of fiscal year 2020.  The release reported that "net revenues increased by 24.6% year-over-year to US$1,071.8 million" and "student enrollments in academic subjects tutoring and test preparation courses increased by 50.4% year-over-year to approximately 2,609,200." In announcing the results, Defendant Yu highlighted the K-12 after-school tutoring business as the "key growth driver," with Defendant Zhou stating the results were driven by the Company's work to "strengthen our online-merge-offline (OMO) standardized classroom teaching system."

198.    In response to an analyst's question about New Oriental's marketing of its Koolearn division in a conference call that day, Defendant Yang denied that "aggressive promotions" by competitors had impacted New Oriental's prospects and that both its online and offline programs would benefit from the Company's investments in teaching training:

Question – Alex Liu: ….I think we just passed through a very fierce strip of competition summer for online. I'm just wondering whether these aggressive promotions has impacted New Oriental's offline business in any way? Thank you.

Answer – Stephen Zhihui Yang: …. And yeah, the online competition is a great question. I think, firstly, the market is so huge. Even though we are one of the market leader, but our offline business, the market share is only 2% – somewhere around 2%, so the market is huge in that. And so far, we haven't seen any negative impact from the recent aggressive online education competition.

And in fact, we're – very revenue acceleration runway in the offline business side. Even though, we have seen some players to spend a lot on the online education on the marketing – selling and marketing expenses, but the key to – after we raised the price, we doubled the price of the summer promotion, we still got with the 820,000 enrollments, which is 8% of the increase compared to last year. And the retention rate is higher than we expected, 59% is a good result.

But our strategy is, we care more. We care both offline business and online business growth. And so, that means we will have true growth engines, offline and online. So, the online, as I said, we're still in process of this investment period to spend more money and time on the R&D and product development and the teachers training or staff training. And so, the online – so, part of the New Oriental's future. But we want to – but on the other hand, the offline business, I think we're doing good for the offline business. Okay. So, we have two growth engines in the future, okay. Thank you.

199.    In response to another analyst's question concerning the advertising spend for the Koolearn business, Defendant Yang said that the Company's focus was to invest in teacher recruitment, training, and "good marketing" for its online division, and that its Koolearn advertising spend would be "reasonable":

Question – Sheng Zhong: Thank you for taking my question. I want to have more color of your margin guidance or about the operating expense. I think, Stephen, you mentioned that in first quarter, there were more spending on the team and the products, so the SG&A costs is a bit similar while the sales/marketing is lower. So, if we look ahead, say, in the coming winter and the next summer season, do you expect more spending on the sales/marketing when the Koolearn's product is more ready? And so in this case – so, what's your guidance or outlook of the sales/marketing spending in the second half of this year? Thank you.

Answer – Stephen Zhihui Yang: Yeah. This quarter, our selling/marketing expenses increased only by 1% in dollar terms year-over-year. And this is our – the strategy as our original plan. Within the core, I think we continue to invest on more

<u>resources or money on the products and teachers' recruitment and training and the content development, as well as good marketing.</u>

But we will spend the reasonable marketing expenses within Koolearn platform in a reasonable way. And we don't use the burning money way to acquire students, as we did in the offline business. And on the other hand, for our offline business, I'm not sure if you remember clearly, last quarter, our selling/marketing expenses didn't increase a lot. So, I do believe we will have more leverage on the selling/marketing side going forward.

200.    The statements above in ¶¶197-99 that the Company had not seen a "negative impact" from competitors' "aggressive" online advertising and that New Oriental would succeed because of its investment in "good marketing," teacher training, and content development, were materially misleading.  Specifically, these statements were materially misleading because they failed to disclose the highly material facts that advertising for New Oriental's Koolearn services involved "illegal acts of false propaganda and price gouging" that were used to drive student enrollments, as well as other deceptive marketing tactics as described in ¶¶84-93.

201.    On January 20, 2020, New Oriental released its financial results for the second quarter of fiscal year 2020.  The release reported that "net revenues increased by 31.5% year-over-year to US$785.2 million" and "student enrollments in academic subjects tutoring and test preparation courses increased by 63.3% year-over-year to approximately 3,789,200"—"solid financial results" that Defendant Yang described on a conference call that day as "mainly driven by increases in student enrollments in K-12 after-school tutoring courses, which continued its strong momentum."  During the question-and-answer segment of the call, Defendant Yang confirmed that "we almost meet all the requirements by new regulations in almost all the cities."

Question – John Choi: Hey, Steve and Sisi. Thanks for taking my question. I have a question on your online. Now, Koolearn basically on the cost said, they'll step up more, opening up in the lower tier cities. Can you kind of give us a sense will the EDU and Koolearn in general will kind of step up the investment in online and as a result, we'll see more on the backend loaded for the fiscal year in terms of marketing expenses and user acquisition costs?

And just quickly, after the regulation which has been in place for more than about a year on the offline schools, are you seeing more visibility or better visibility compared – given that smaller players are being phased out and as a result you're seeing higher retention rate and better capacity growth in selective regions? Thank you.

\*\*\*

And yeah, your number two question is about regulation. Last year, there was several – the new regulations and – but as I said in the last two earnings call, we almost meet all the requirements by new regulations in almost all the cities. And we have seen some small players disappear from the market. And we have seen some students join our classes who are the students from the small player. So I think our target even going forward is to provide the best of service to the Chinese students. And we believe we can take more market share from the old players in the market. Okay? Thank you.

202.    Similarly, in response to another analyst's question about the "notable jump" in gross margin during the quarter, Defendant Yang explained that "we're taking market share from the small players."  In response to another analyst's question asking "how much revenue growth is actually coming from organic growth versus stealing market share from other small players," Defendant Yang and New Oriental investor relations representative Sisi Zhao responded that the "majority" of revenue growth was the result of taking market share from competitors:

Question – Youngrin Kim: Hi, management. Congrats on the good quarter. I have two questions. The first is how much of revenue growth is actually coming from organic growth versus stealing market share from other small players? That's my first question.

\*\*\*

Answer – Stephen Zhihui Yang: Okay. Yeah, the organic growth, I think typically in the first 12 months after the new learning centers opening, it will bring largely the – for example, we opened 20% new learning centers, but in the first – year one, typically it will bring us 5% to 10% new revenues, so...

Question – Youngrin Kim: Sure. Okay.

Answer – Stephen Zhihui Yang: And so, I think all the others are the organic growth. And the markets – we don't have the numbers of how much market share we get from the small players, okay. We just look at our business to get a 30% top line growth, that's it, okay? Sisi, you have the numbers?

Answer – Sisi Zhao: No. It's hard to quantify, but we keep taking market share from small players every day, almost every day and the market growth is like 10%, 15%. But our K-12 businesses are growing over 40%. So, definitely, majority of the growth is from taking market share from other small players in each city….

203.   The statements above in ¶¶201-02 that New Oriental had "almost [met] all the requirements by the new regulations in almost all the cities" and that the Company was increasing enrollment due to smaller players "disappear[ing] from the market" and by "taking market share from other small players" were materially misleading.  Specifically, it was materially false and misleading to suggest that New Oriental's results had benefited from increased government scrutiny and industry consolidation because that statement omitted the highly material facts set forth above in ¶¶84-93 that New Oriental's results had been secretly impacted by its deceptive advertising practices and other regulatory violations, and the fact that the Company's actual practices invited the same government scrutiny and sanctions that New Oriental misleadingly claimed only impacted "small players."

204.   On April 21, 2020, New Oriental disclosed its financial results for the third quarter of fiscal year 2020—the first earnings release after major lockdowns spurred by the onset of the pandemic.  In the release, New Oriental reported that "net revenues increased by 15.9% year-over-year to US$932.2 million" and that "student enrollments in academic subjects tutoring and test preparation courses increased by 2.3% year-over-year to approximately 1,606,100."  In the release, Defendant Yu stated that, "[d]espite the challenges posed by the outbreak of COVID-19 in China," New Oriental still "recorded top line growth," attributing the Company's ability to move "offline classes to small size online live broadcasting classes through the self-developed OMO (online merging offline) system," as playing "a fundamental role in cushioning the impact on our service and operation" during the pandemic.  In the addressing these results, Defendant Yang described a

"three step" process New Oriental was going to employ to deal with the pandemic, including increased initiatives and investments in the Koolearn.com platform.

205.    In the question-and-answer period of the call, Defendant Yang reiterated the potential "opportunities" presented to large players like New Oriental during the pandemic:

Question – Binnie Wong: Thank you. Thank you. Okay. Good. So actually just wanted to follow up here, I think you mentioned a very good point about the consolidation angle. So how should we see about, in terms of during this, like the crisis that we're seeing, right, are there any actually like closure of some of the smaller ones and are they mostly the online ones or the offline ones and so for us to think about like longer term, how we should see our market share gains from here?

And then a second question here is also that, I think you talked about that in terms of our online growth is of course doing very well given the current situations and is it also that we are thinking about our user acquisition, right, because in the past our recruitment for the online students has also been relying on some of our local resources. Would that make our strategy also modified a bit so that we can accommodate because this situation might still prolong for some time? And having said that, do you think we are seeing the trough already with second quarter growing a single digit growth, do you think this is the trough we should expect? Thank you.

Answer – Stephen Zhihui Yang: Okay. Yeah. Let me answer your first question about the market consolidation opportunity. Yeah, as the disease subsides gradually, I think there will be a potential opportunity for the – of the market consolidation especially for the big players. We have seen a lot of small players, they faced a severe impact that may cause some of them to shut down their business and you know New Oriental as one of the leading players in the market. So we are well prepared to take the more market share after the pandemic is over. Yeah that's why we still opened the new learning centers in new cities and existing cities.

And also in the Q3, we successfully moved all the offline students to online since later February. So I think the small players cannot copy us, so that's why I said it's a great opportunity for the bigger players like the New Oriental.

Yeah, the pure online, Koolearn, yeah, we did spend a little bit more money in Q3 and yeah a little bit more in Q4 – in the coming quarter to acquire new student enrollment because the pandemic – when the pandemic calms, I think it's a great opportunity for the big online players. So, yeah, I think – anyway, we got a lot of the enrollment during the pandemic and I think the money we spent is worthy and is understandable. I think even though we spent a lot in Q3, but we still got the margin expansion for the overall company.  So that's it.

206.    The statements above in ¶¶204-05 that New Oriental would benefit from continuing market consolidation brought on by the pandemic were materially misleading.  Specifically, it was materially false and misleading to suggest that the pandemic presented a "great opportunity" for large players like New Oriental, which was supposedly able to take advantage of its "number one brand name" and superior teaching quality, while failing to disclose that New Oriental's growth and revenues during the pandemic were secretly impacted by "illegal acts of false propaganda and price gouging," as set forth above in ¶¶84-93.

207.    On July 28, 2020, New Oriental released its financial results for the fourth quarter of fiscal quarter 2020.  The release reported that "net revenues decreased by 5.3% year-over-year to US$798.5 million" and "student enrollments in academic subjects tutoring and test preparation courses decreased by 6.2% year-over-year to approximately 2,585,600." In the release, Defendant Yu stated that "the outbreak of COVID-19 pandemics around the globe starting from March posed continuing pressure on our key business lines" but that Koolearn's online platform had "successfully contributed a significant increase in new customers."

208.    Defendant Yang explained in a conference call that day that the Company "continue[d] placing more resources in Koolearn in executing new initiatives in our K-12 online after-school tutoring business," including "content development, teachers' recruiting and training, sales and marketing, R&D and other necessary comp expenses to drive the growth of the new online programs."   In response to an analyst's question about whether New Oriental had been "aggressive" enough in advertising its online programs, Defendant Yang represented:

> Question – Tommy Wong: Okay. Thank you. Hi, Stephen and Sisi. I just have a general question. If you look at the overall market we can see a lot of the online players like Youdao and GSX, their share prices are really, really well. And when I am looking at your selling expenses, it seems it has not really increased a lot. I was like kind of, I was kind of expecting it to increase a little bit for the fourth quarter but it actually hasn't increased. I'm kind of concerned are we not being

aggressive enough and maybe if we can talk about your sales and marketing kind of breakdown between the OMO and versus Koolearn, and what's your strategy going forward. I'm just kind of concerned that we're not being aggressive. Thank you.

Answer – Stephen Zhihui Yang: Yeah. I think we wasted – we spent a little bit more money on the Koolearn.com in the last quarter. We did – the first is the – I think we did the first time the free course for the large type class in the spring semester. But as I said in the last earnings call we don't want to spend increasing money on marketing side. We would rather spend more money on the R&D and teachers' training and some like the core product development. And but yeah, I know there are some players who spend a lot of money on the marketing side. But I think the market is huge enough and we are special because we have been the number one education brand name in China. And I think the Koolearn can benefit from the – our New Oriental's brand name to acquire the new student enrollment. This is very unique.

209.    The statements above in ¶¶207-08 contrasting New Oriental's marketing spend and approach from "players who spend a lot of money on the marketing side" was materially misleading. Specifically, it was materially misleading to suggest that New Oriental was conservative in its marketing spend and efforts and instead relied on the "brand name to acquire the new student enrollment" while omitting the highly material facts that, in truth, New Oriental "repeatedly" violated regulations governing its business including through "illegal acts of false propaganda and price gouging," as set forth above in ¶¶92-93, with respect to its Koolearn division.

### 2.    Materially False and Misleading Statements Concerning New Oriental's Revenue Drivers during Fiscal Year 2021

210.    On October 13, 2020, New Oriental released its financial results for the first quarter of fiscal year 2021. The release reported that "net revenues decreased by 8.0% year-over-year to US$986.4 million" and "student enrollments in academic subjects tutoring and test preparation courses increased by 13.5% year-over-year to approximately 2,961,100." In the release, Defendant Yu described "encouraging results" from its "key growth driver, K-12 all-subjects after-school tutoring business," highlighting the Company's "continued improved services and best-in-class learning experience."

211.    During an investor call that same day, Defendant Yang addressed the importance of the Koolearn division's contributions during the pandemic, noting that "Koolearn has dedicated a significant amount of investment to marketing and service enhancements in the past two quarters to attract customers during the peak of the pandemic, but we expect spending to be normalized in the coming quarter as we will be cautious in identifying high ROI marketing channels and evaluate the unit's economics in real time which will, in return, keep the average user acquisition cost at a relatively low level," with "positive word of mouth promotion and brand loyalty, Koolearn will continue to quickly acquire new users while enhancing the student retention rate."

212.    In the question-and-answer period of the call, Defendant Yang addressed an analyst's questions about the OMO model, and specifically pointed to the role of New Oriental's "Famous Teachers" in promoting its online programs:

> We are doing the new OMO model by three ways. Number one, the large classes, that means the large classes. And, this is a totally majority of the classes are happening online and I think the price of that part of the course I think it's 20% to 30% lower than our normalized classes. And suddenly, the OMO multi-class, it's a hybrid class and it's offline and online integrated classes.
>
> And the last one, number three is some the very short-term courses. I think the typical purpose of both part of the businesses is to apply the new student enrollment in very short-term courses and we ask the famous teachers to record the courses. And I think this is kind of the way to ask the [] way.

213.    The statements above in ¶¶210-12 concerning the advantages of New Oriental's Koolearn division and New Oriental's aOMO model were materially misleading because they failed to disclose that, rather than rely on "positive word of mouth and brand loyalty," New Oriental's marketing strategy for Koolearn employed "illegal acts of false propaganda and price gouging," including the falsification of the credentials and qualifications of the "Famous Teachers," as set forth above in ¶¶84-93.

214.    On January 22, 2021, New Oriental released its financial results for the second quarter of fiscal year 2021.  The release reported that "net revenues increased by 13.1% year-over-year to US$887.7 million" and "student enrollments in academic subjects tutoring and test preparation courses increased by 10.4% year-over-year to approximately 4,183,100" students.  In the release, Defendant Yu described New Oriental's business achieving "good recovery progress," with K-12 all-subjects after-school tutoring business remaining the "key growth driver."

215.    During an investor call that day, Defendant Yang highlighted a positive "recovery" for New Oriental's Koolearn programs, highlighting that, "as a result of the improvements to operational teams, as well as positive word-of-mouth promotion and brand loyalty, Koolearn will continue to quickly acquire new users while enhancing the student retention rate."  During the question-and-answer period, Defendant Yang also answered an analyst's question about New Oriental's pricing strategy:

> Question – Sheng Zhong: Hi. Good evening. Thank you for taking my question. Just one question about your offline price. You mentioned that it increased very strong. So, wondering the reasons of the price increase, especially there were a lot of competition from the online and also, we see the small – the supply to small institutions, they also provide price discount. Is it because you see the offline supply decrease post-COVID-19 or for some other reason, is that your pricing strategy? Thank you.
>
> Answer – Stephen Zhihui Yang: Hi, Sheng Zhong. I think our price strategy has been very consistent and this quarter's hourly blended ASP was flat. And yeah, we raised the price of the U-Can program by 5% – by 8%. And VIP – U-Can VIP price increase was 5%, top case, we keep the same price.
>
> I don't think the online platform's competition will impact our – the price strategy. I'm not sure you remember clearly or not, we did the very good, successful summer promotion half a year ago. And during the summer, we got more than 1 million the summer promotion enrollment. And we charged RMB 400. I think it's much expensive than the other – the online players.  Most of them were providing the free course.  And – but our retention rate was over 60%. <u>So, I think the Chinese parents and students, they care more about the teaching quality and the study result of their kids rather than the price. So, going forward, I think our price strategy will be consistent.</u>

216.    The statements above in ¶¶214-15 differentiating New Oriental's offline pricing strategy from onlione competitors who provided "discounts" was materially false and misleading because, in truth, New Oriental's pricing strategy included misleading parents and customers through "illegal acts of false propaganda and price gouging" that included providing false and misleading discounts, as set forth above in ¶¶84-93.

C.    **Materially False and Misleading Statements Concerning Increased Government Regulation and Scrutiny of the After-School Tutoring Industry**

217.    In the months leading up to the Chinese government's ban on the for-profit after-school tutoring industry, New Oriental received substantial nonpublic information regarding the government's approval of the Double Reduction measures.  Despite possessing this plainly material information, the Company repeatedly made false and misleading statements concerning government scrutiny into the industry and its impact on New Oriental's business.

218.    For example, on January 24, 2021, Defendant Yang appeared on Bloomberg Markets: China Open.  When asked: "what are your key concerns when it comes to regulatory challenges?  What other additional regulations that you see potentially in the pipeline," Defendant Yang responded: "I think two years ago, there was a new regulation from the government, from the government, on the K-12 after-school tutoring business.  And as for the market leader in the market, I think we performed very well to meet the new requirements from the government. So far, we don't anticipate any new regulations from the government."

219.    Then, more than one month after the Two Sessions in March 2021, New Oriental addressed the government regulations concerning after-school tutoring and rumors concerning an impending government crackdown in detail on its earnings call for the second quarter of 2021. Specifically, on April 20, 2021, in response to analysts' questions during the question-and-answer segment of the investor call, Defendant Yang represented that "the government's intention to

tighten after-school tutoring business policy is not a surprise to us," and claimed New Oriental

"do[es] not foresee any material impacts on top line."  Specifically, Defendant Yang represented:

> Question – Felix Liu: Good evening, management. Thank you very much for taking my questions and congratulations on the strong quarter. My question is on regulation. I know during the past few months, <u>the regulator has made some relatively strict comments on the after-school tutoring regulations.</u> So, could you share some color about your take on potential regulation direction? Will there be any tightening in terms of new learning center license, ASP as well as after-school tutoring scheduling?  Thank you very much.

> Answer – Stephen Zhihui Yang: Felix, it's a good question. Actually, <u>the government's intention to tighten after-school tutoring business policy is not a surprise to us.</u> As you know, it has been discussed for a long time, since 2018. <u>And we believe the regulations efforts will foster a positive environment for the whole market to improve the market standard and enhance the average teaching quality of the whole market. And I think we are aligned with the government policy</u> and also full – and fully committed to work together with the government to build a better – the education market in China.

> I think the reform details are yet to be announced. So now, we are unable to provide a full analysis on our business impacts. But at this stage, <u>we do not foresee any material impacts on top line.</u>  And we do expect some – the admin cost may increase in short-term to meet the new requirement.

> As the largest provider, New Oriental, I think we are – we have the strong capital to be compliant with the potential reform, the policy reform.  And at the same time, we expect that China's after-school tutoring market to further be consolidated. And we have been in preparation for this and we're ready to further take more market share from the other players, Felix.

220.    On May 17, 2021, New Oriental attended HSBC's 8th Annual China Conference.

HSBC reported on discussions with New Oriental management, relaying that "management expect

enhanced implementation of the existing regulations and believe <u>the purpose is not to wipeout the</u>

<u>industry</u> but to regulate the highly fragmented market to ease the study burden on students. With

regard to the potential restrictions on tutoring hours, management think the likelihood of

completely banning after-school tutoring (AST) during weekends is low."

221.    On June 25, 2021, Morgan Stanley released an analyst report detailing discussions its analysts had with New Oriental management at Morgan Stanley's China BEST Conference. The report stated, in pertinent part:

> The company has not taken any steps yet, but management believes even under a worst case scenario there should still be room for adjustment, e.g. class scheduling more to weekdays, improve utilization of weekdays and enlarge class size of weekdays given current utilization is below ⅔ and weekdays' utilization is lower than weekend . . . However, it does not have any detailed plan yet, but will make changes to its business model when there's clearer confirmation from the government on final policy.

222.    Throughout 2021—and even after Defendants reviewed the Double Reductions policies that President Xi had formally approved but before that ban was made public—Defendants made a series of false claiming that the Double Reduction policies would not have a significant impact on New Oriental and falsely denying that the Company was then taking secret extraordinary measures to realign its business in light of the new restrictions.

223.    For example, when reporters questioned New Oriental about the massive layoffs of 20% of its online division employees that the Company had been undertaking since March 2021 in response to the new regulations, New Oriental falsely claimed in a report published on April 23, 2021 that these layoffs were ordinary course "quarterly optimization" measures.  Similarly, when questioned by *Reuters* about regulators pulling New Oriental commercials from state television stations, New Oriental misleadingly stated in a May 21, 2021 report that it had not purchased any advertisements in the past two months while omitting the highly material facts that it was then undertaking extensive measures to realign the Company's business in an effort to comply with the Double Reduction measures.

224.    Further, in response to a leaked report of an internal Company meeting in June 2021 showing that the Double Reduction measures would eliminate 70% of the Company's revenues— at a time before the Double Reduction measures had been publicly disclosed—New Oriental

falsely denied the reports.  Specifically, Defendant Yu dismissed and "refuted the rumors" concerning these facts and falsely denied having any knowledge of Double Reduction, saying: "New Oriental has never held such a meeting, and we do not know any news. Life is not easy, why stab in the back."  Also on June 18, 2021, and in response to news that increased government scrutiny would result in a ban of after-school tutoring on weekends and holidays, New Oriental published a false and misleading blog post that "refuted additional rumors circulating on WeChat of an internal company discussion that there would be no classes on weekends and holidays beginning in 2022."  Significantly, these false claims had their intended effect, and helped stem and in fact reverse a dramatic decline in New Oriental's share price.

225.    Last, in response to reports and the disclosure of a draft of the Double Reduction measures that had been circulated online and reported by major media outlets on July 23, 2021, New Oriental filed a press release that sought to downplay the Double Reduction measures and stem the Company's share price decline.  Specifically, New Oriental filed a Form 6-K with the SEC on July 23, 2021 in which the Company acknowledged "that certain English and Chinese language media outlets reported that the PRC regulators are considering a new set of regulations concerning after-school tutoring service related to school subjects taught in China's compulsory education system," but misleadingly stated that New Oriental stated that "has not received official notification of the regulations" and refused to offer further comment on the pending crackdown or its impact on New Oriental.

226.    The statements set forth above in ¶¶218-25 downplaying the impact of the planned government regulations were materially false and misleading because, as described above in ¶¶106-07, 114-125, 151-55, New Oriental knew in intimate detail the highly material and devasting effect the Double Reduction policies had on its core business.  The statements denying

or dismissing reports concerning the various measures the Company was secretly taking at the time to pivot its business into new areas that would not be prohibited by the ban were materially false and misleading because, in truth, the Company was taking those drastic measures as set forth above at ¶¶114-18, 161, and was doing so precisely because the Double Reduction measures posed an existential threat to the Company.  It was materially false and misleading for New Oriental to speak publicly regarding the possibility of increasing regulation, to state that the regulations would benefit New Oriental as a "market leader" that could capitalize on further industry consolidation, and to deny the regulations would have a "material" impact when, in truth, as set forth above at ¶¶106-07, 119-25, Defendants knew the government's sanctions would be severe, that the Double Reduction measures that President Xi approved but were not publicly disclosed would eliminate 60% of New Oriental's revenues, and that the Company was then taking drastic efforts to realign its because of the material impact of the Double Reduction policies.

## VIII.  LOSS CAUSATION

227.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses.  During the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of New Oriental ADSs and operated as a fraud or deceit on Class Period purchasers of New Oriental ADSs.

228.    Specifically, Defendants failed to disclose and misrepresented the adverse facts detailed herein, including that: (1) New Oriental routinely failed to comply with regulations governing the for-profit education industry; and (2) increased government scrutiny and measures implemented by the government concerning the for-profit education industry during the Class Period posed an existential threat to New Oriental's business.

229.    Later, when Defendants' misrepresentations and the risks concealed by the fraudulent conduct were disclosed to the market and subsequently materialized, the price of New Oriental ADSs declined significantly as the prior artificial inflation came out of the Company's ADS price, including on May 12-13, 2021, May 12-24, 2021, June 1-3, 2021, June 16-17, 2021, and July 23-25, 2021.  Defendants' misstatements and omissions were the proximate cause of those share price declines and the losses suffered by Class members. The disclosures that corrected the market price of New Oriental ADSs and reduced the artificial inflation caused by Defendants' materially false and misleading statements and omissions are summarized in the chart below, which identifies the disclosure event, the price declines in New Oriental ADSs resulting from the event as compared to the prior day's close, and the percentage decline:

| Date | Event | Price Change | % Change |
|------|-------|-------------|----------|
| 5/12/2021-5/13/2021 | *Reuters* reports regulators are removing New Oriental commercials and warns of possible restrictions on after-school tutoring. | $142.80 to $115.10 | -19.4% |
| 5/21/2021-5/24/2021 | President Xi "reviewed and passed" measures that press reports indicated represented a "clampdown" on "qualification of after-school tutors, false advertising and overcharging for services." | $117.50 to $90.70 | -22.8% |
| 6/01/2021-6/03/2021 | New Oriental fined for falsifying teacher credentials and engaging in other deceptive practices. | $102.30 to $93.20 | -9% |
| 6/16/2021-6/17/2021 | *Reuters* reports regulations could be more severe than previously reported, and a separate report suggests New Oriental projects a 70-80% revenue decline. | $95.40 to $76.30 | -20% |
| 7/23/2021-7/25/2021 | Chinese government announces regulations banning for-profit after-school tutoring.  New Oriental admits material adverse impact of regulations that ban for-profit tutoring. | $64.00 to $19.40 | -69.7% |

230.    As a result of their purchases of New Oriental ADSs during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. Defendants' materially false and misleading statements caused New Oriental

ADSs to trade at artificially inflated levels throughout the Class Period, reaching as high as $196.97 per share on February 16, 2021.

231.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of New Oriental's business and prospects. As true facts about the Company were revealed to the market, the price of New Oriental ADSs fell significantly. These declines removed the inflation from the price of New Oriental ADSs, causing real economic loss to investors who had purchased New Oriental ADSs during the Class Period.

232.    The declines in the price of New Oriental ADSs after the corrective disclosures came to light were a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in New Oriental ADSs negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

233.    The economic loss, i.e., damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of New Oriental ADSs and the subsequent significant decline in the value of New Oriental ADSs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX.    PRESUMPTION OF RELIANCE

234.    At all relevant times, the market for New Oriental ADSs was an efficient market for the following reasons, among others:

(a)    New Oriental ADSs met the requirements for listing and its ADSs were listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)    New Oriental filed periodic public reports with the SEC and the New York Stock Exchange;

(c)    New Oriental regularly publicly communicated with investors via established market-communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    New Oriental was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

235.    As a result of the foregoing, the market for New Oriental ADSs promptly digested current information regarding New Oriental from all publicly available sources and reflected that information in the price of New Oriental ADSs. Under these circumstances, all purchasers of New Oriental ADSs during the Class Period suffered similar injury through their purchase of New Oriental ADSs at artificially inflated prices, and the presumption of reliance applies.

236.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding New Oriental's business—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of New Oriental's compliance with Chinese regulations, as alleged above, that requirement is satisfied here.

## X.    THE STATUTORY SAFE HARBOR DOES NOT APPLY TO DEFENDANTS' FALSE AND MISLEADING STATEMENTS

237.    The statements alleged herein to be materially false and misleading are not subject to the protections of the PSLRA's statutory Safe Harbor for forward-looking statements because:

(a) they are not forward looking; (b) they are subject to exclusion; or (c) even if purportedly forward-looking, Defendants cannot meet the requirements for invoking the protection, i.e., identifying the statements as forward looking and demonstrating that the statements were accompanied by meaningful cautionary language.

238.    Many of the statements were misleading in light of omissions of material present or historical facts and cannot be considered forward-looking.

239.    Under the PSLRA's statutory Safe Harbor for written statements, a forward-looking statement is protected if it is identified as such and "accompanied by meaningful cautionary language." 15 U.S.C. § 78u-5(c)(1)(A)(i). An oral forward-looking statement must be accompanied by a cautionary statement that it is forward-looking, that actual results may differ materially and that additional information concerning risk factors is contained in a readily available written document. In addition, the oral statement must: (i) identify the written document, or portion thereof, that contains such factors; and (ii) the referenced written documents must contain meaningful cautionary language. 15 U.S.C. § 78u-5(c)(2)(B).

240.    The Safe Harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with Generally Accepted Accounting Principles ("GAAP"). 15 U.S.C. § 78u-5(b)(2)(A).

241.    Statements of historical fact, current condition or a mixture thereof are not "forward-looking" and thus not protected by the Safe Harbor.

242.    To the extent any of the statements were identified as forward-looking statements, they do not fall within the protections of the Safe Harbor because they lacked specific, meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. A warning that identifies a

potential risk, but implies that such a risk had not materialized, i.e., states that something might occur but does not state that something actually has already occurred, is not meaningful and does not fall within the protections of the Safe Harbor.

243.    Meaningful risk disclosures must also be substantive and tailored to the forward-looking statement they accompany. Many of Defendants' purported risk disclosures remained unchanged over the course of the Class Period, despite the fact that such risks had in fact materialized, which change in circumstance was material to the reasonable investor. Defendants' risk disclosures were therefore neither substantive nor tailored and do not satisfy the requirements of the Safe Harbor.

244.    Nor were the historic or present-tense statements made by Defendants assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

245.    Defendants' forward-looking statements also do not fall within the protections of the Safe Harbor because they had no reasonable basis. Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of New Oriental, who knew that those statements were false or misleading when made.

## XI.    CLASS ACTION ALLEGATIONS

246.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired New Oriental ADSs during the Class Period, i.e., from October 23, 2018 through July 25, 2021

inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants; members of the immediate families of the Executive Defendants; New Oriental's subsidiaries and affiliates; any person who is or was an officer or director of New Oriental or its subsidiaries and affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

247.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. The Company's ADSs are actively traded on the NYSE and there are more than 1.6 billion shares of New Oriental ADSs outstanding as of September 17, 2021, New Oriental's latest Annual Report. While the exact number of Class members is unknown at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by New Oriental, its transfer agent, or its depository bank and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

248.    Common questions of law and fact predominate and include:

(a)    whether Defendants violated the Exchange Act and SEC Rule 10b-5;

(b)    whether Defendants omitted and/or misrepresented material facts;

(c)    whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants knew or recklessly disregarded that their statements were false;

(e)    whether Defendants' statements and/or omissions artificially inflated the price of New Oriental ADSs;

(f)    whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)    the extent and appropriate measure of damages.

249.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

250.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

251.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII.   COUNTS

### COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants.**

252.    Lead Plaintiff repeats and realleges every allegation above as if fully stated in this Count.

253.    This Count is asserted on behalf of all members of the Class against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

254.    During the Class Period, Defendants the false statements specified above, which they knew or recklessly disregarded were materially misleading in that they contained

misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

255.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of New Oriental ADSs during the Class Period.

256.    Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of deceptive of business that operated as a fraud by disseminating false and misleading statements as described above.  As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), Defendants not only made and disseminated false statements as set forth above, but engaged in fraudulent business practices to mislead customers about New Oriental and Koolearn's programs' costs, teacher qualifications, and quality of instruction, including by engaging in conduct that Chinese regulators found were "illegal acts of false propaganda and price gouging" that warranted the highest penalties under the law.

257.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for New Oriental ADSs. Lead Plaintiff and the Class would not have purchased New Oriental ADSs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

258.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of New Oriental ADSs during the Class Period.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Executive Defendants.

259.    Lead Plaintiff repeats and realleges every allegation above as if fully stated in this Count.

260.    This Count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

261.    During the Class Period, the Executive Defendants acted as controlling persons of New Oriental within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about New Oriental, the Executive Defendants had the power and ability to control the actions of New Oriental and its employees. New Oriental violated Section 10(b) of the Exchange Act and Rule 10b-5, as set forth above. By reason of such conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII.   PRAYER FOR RELIEF

262.    WHEREFORE, Lead Plaintiff prays for judgment as follows:

(a)    Determining that this action is a proper class action, certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Counsel as Class counsel;

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

(c)    Awarding Lead Plaintiff's reasonable costs and expenses incurred in this action, including attorneys' fees and expenses; and

      (d)      Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

## XIV.  JURY DEMAND

263.  Lead Plaintiff demands a trial by jury.

Dated:  September 2, 2022

*/s/ Michael D. Blatchley*          
Michael D. Blatchley
**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**
Salvatore J. Graziano
Michael D. Blatchley
Mathews R. de Carvalho
Jonathan G. D'Errico
1251 Avenue of the Americas
New York, NY 10020
Phone: (212) 554-1400
Fax: (212) 554-1444
salvatore@blbglaw.com
michaelb@blbglaw.com
mathews.decarvalho@blbglaw.com
jonathan.derrico@blbglaw.com

*Lead Counsel for Lead Plaintiff ACATIS
Investment Kapitalverwaltungsgesellschaft
mbH and the Class*

**GLOSSARY OF CERTAIN TERMS, INDIVIDUALS, AND ABBREVIATIONS**

| Term/Abbreviation | Definition |
|---|---|
| ADS | American Depository Shares. |
| Chinese Association of Non-Government Education or "CANGE" | Also referred to as China Private Education Association, this is an industry lobbying group for private for-profit education companies whose purpose "is to implement the party's educational policy." Defendant Yu is a senior leader of CANGE. |
| AST | After-school tutoring. |
| Cai Qi | Communist Party Secretary of Beijing, former Mayor of Beijing, and senior member of the Chinese Communist Party. |
| Central Commission for Discipline Inspection or "CCDI" | The highest internal control institution of the Chinese Community Party which is responsible for policing loyalty to the Chinese Communist Party. |
| Chen Baosheng | The Minister of Education of China's Ministry of Education during the Class Period. |
| China Democratic League | The largest of China's eight legally-recognized minority parties which largely comprised of intellectuals across various fields. |
| Chinese People's Political Consultative Conference or "CPPCC" | China's national advisory body that meets in parallel with the country's parliament. Defendant Yu is a CPPCC delegate. |
| Circular 80 | Opinion on Supervising After-School Tutoring Institutions, a set of key regulations issued by the Chinese State Council in August 2018. |
| Class Period | October 23, 2018 through July 25, 2021, inclusive. |
| Defendants | New Oriental Education & Technology Group Inc., Michael Minhong Yu, Chenggang Zhou, and Zhihui Yang. |
| Double Reduction | *Opinions on Further Reducing the Burden of Homework and Off-Campus Tutoring for Students Undergoing Compulsory Education*, the policy approved by President Xi Jinping in May 2021 and disseminated to the general public in July 2021 which, among other things, banned for-profit after-school tutoring in China. |
| Executive Defendants | Defendants Yu, Yang, and Zhou. |
| HKEX | The Stock Exchange of Hong Kong. |
| Koolearn | Koolearn Technology Holding Ltd., New Oriental's online-education subsidiary. |
| Lead Plaintiff | ACATIS Investment Kapitalverwaltungsgesellschaft mbH. |
| Leading Group on Comprehensively Deepening Reform or "LGCDR" | A political body led by President Xi Jinping which discusses and designs policy in key areas, including education. |

| Term/Abbreviation | Definition |
| --- | --- |
| Li Keqiang | Premier of the Chinese government and second most powerful political figure China. |
| Michael Minhong Yu | Billionaire founder and chairman of New Oriental and Koolearn.  Member of the China Democratic League and delegate to the CPPCC, China's top political advisory body. |
| Ministry of Education | Cabinet-level agency responsible for regulating and monitoring all aspects of the educational system in China. |
| New Oriental | New Oriental Education & Technology Group Inc. |
| National People's Congress or "NPC" | China's main legislative body. |
| State Administration for Market Regulation | Ministry-level entity within the State Council responsible for regulating market entity registration, commodity prices, commercial, and quality inspection, certification, and accreditation. |
| State Council | Chief administrative authority of the Chinese national government. |
| Sun Chang | Director of Koolearn, senior executive at New Oriental. |
| Tutoring Negative List | Exemplar list of curriculum content that would violate Circular 80 that was designed to help education companies better understand the limits imposed by Circular 80. |
| Two Sessions | Annual meetings China's two primary political bodies, the CPPCC and NPC. |
| WeChat | Instant messaging and social media application used in China. |
| Xi Jinping | President of China. |
| Yin Qiang | Director of Koolearn, senior executive at New Oriental. |